[Cite as *State v. Messenger*, 2021-Ohio-2044.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

State of Ohio,                                             :

      Plaintiff-Appellee,                          :            No. 19AP-879
                                          (C.P.C. No. 19CR-1135)

v.                                                         :

                                          (REGULAR CALENDAR)

Kandle G. Messenger,                                       :

      Defendant-Appellant.                        :

---

D E C I S I O N

Rendered on June 17, 2021

---

**On brief:** [*G. Gary Tyack*], Prosecuting Attorney, and *Daniel J. Stanley*, for appellee. **Argued:** *Seth L. Gilbert.*

**On brief:** *Carpenter Lipps & Leland LLP*, *Kort Gatterdam*, and *Erik P. Henry*, for appellant. **Argued:** *Kort Gatterdam.*

---

APPEAL from the Franklin County Court of Common Pleas

LUPER SCHUSTER, J.

{¶ 1} Defendant-appellant, Kandle G. Messenger, appeals from a judgment entry of the Franklin County Court of Common Pleas finding him guilty, pursuant to jury verdict, of murder with an accompanying firearm specification. For the following reasons, we affirm.

## I. Facts and Procedural History

{¶ 2} By indictment filed March 7, 2019, plaintiff-appellee, State of Ohio, charged Messenger with one count of murder in violation of R.C. 2903.02, an unclassified felony; and one count of felony murder in violation of R.C. 2903.02, an unclassified felony, with an underlying offense of felonious assault, in violation of R.C. 2903.11. Both charges contained accompanying three-year firearm specifications pursuant to R.C. 2941.145(A). The charges

related to the shooting death of Richard Pack Jr. on February 25, 2019. Messenger entered a plea of not guilty.

{¶ 3} At a trial beginning November 4, 2019, the state introduced evidence that on the evening of February 25, 2019, Messenger shot Pack 14 times while inside a residence they once shared together, killing Pack. Messenger and Pack were stepbrothers. The sole issue at trial was whether Messenger acted in self-defense.

{¶ 4} During the trial, the state presented testimony establishing that 2065 West Mound, the location in which the shooting occurred, was once home to Pack and Samantha Anderson, who were in a relationship, and their two young children. Approximately one year after Pack and Anderson first moved into the West Mound residence, Samantha's sister, Breanna Anderson, and her fiancée, Tiffany Wiseman, came to live with Pack, Samantha, and their children. Sometime after Breanna and Wiseman moved in, Messenger also moved into the West Mound residence. Messenger was in a romantic relationship with Sandra Gheen in early 2019, and Gheen also lived at the West Mound residence for some time. However, Samantha testified that she and Messenger began a secret relationship while the three couples were living together. Samantha testified that she and Pack ended their relationship, and Pack moved out of the West Mound residence approximately one month before the shooting. Gheen also moved out of the West Mound residence in January 2019, prior to the shooting.

{¶ 5} According to Gheen's testimony, on the morning of February 25, 2019, she learned of the relationship between Messenger and Samantha after seeing text messages on Messenger's phone in which Samantha expressed her hope to marry Messenger. Gheen testified she decided to send the text messages to Pack, and then she met with him to discuss what they had learned. While she was with Pack, Gheen said she overhead Pack talking on the phone with Messenger.

{¶ 6} Samantha testified that around mid-afternoon on February 25, 2019, after Pack saw the text messages between herself and Messenger, he asked to talk to Samantha about the infidelity. After about ten minutes of conversation with Pack, Samantha said that Messenger arrived at the residence. Samantha testified that when Messenger came in the room, Pack asked Messenger to have a seat and then Pack began hitting Messenger. Samantha said Messenger did not attempt to fight back during this altercation, and Pack

eventually left the home. Samantha said she did not see either Messenger or Pack with a weapon during this fight. Messenger did not require medical attention from this interaction, and Samantha stated no one present called 911. Prior to this incident, Samantha said she had never seen a physical fight between Pack and Messenger.

{¶ 7} Later in the evening on February 25, 2019, Samantha said Pack returned to the West Mound residence and "hop[ped] the fence" into the yard. (Tr. at 188.) Samantha testified that Messenger was already outside at this point, and she was sitting in her car when Pack approached her vehicle to talk more about their relationship. She described Messenger as keeping his distance but observing the interaction between Pack and herself. Eventually, Samantha said she agreed to go inside and continue talking to Pack.

{¶ 8} Samantha described Pack attempting to get Messenger to come inside with them but that Messenger initially refused. Once Messenger agreed to come in the house, Samantha said Pack shut and locked the door, at which time Samantha said she went upstairs to check on her children. Samantha explained that the only way to get the door in the house to close was to lock it. While she was upstairs, Samantha said she heard Messenger say "[Pack], stop. [Pack], don't. Don't come any closer. Please, [Pack], I'm begging you. [Pack], stop," followed by gunshots, and she came back downstairs to find Messenger holding a gun. (Tr. at 206.) Samantha testified she then called 911, and the state played an audio recording of her 911 call for the jury. In the 911 call, Samantha told the dispatcher that Pack had been shot and that Messenger was the one who shot him, but she also told the dispatcher that Pack beat her before backtracking and saying Pack beat Messenger prior to the shooting.

{¶ 9} Additionally, Samantha testified that Pack worked as an armed security guard and, as a result, had a "good knowledge of firearms." (Tr. at 209.)

{¶ 10} Rebecca Lape lived next door to 2065 West Mound, and she testified that on February 25, 2019 around 9:00 p.m. she heard people arguing outside, so she looked out her window and saw Pack yelling back and forth with someone in a car. Rebecca testified that she saw Messenger approach Pack several times before Pack yelled, with his arms up, "if you're going to do it, just do it." (Tr. at 225.) She then heard Pack say "you ain't going to do nothing. Just put it away." (Tr. at 237.) After that, Rebecca said she watched Pack go inside the house but that he did not close the door behind him. Messenger was still

outside the house when Rebecca stopped looking out her window. She also noticed Pack's children looking out the window of their house at the altercation. Rebecca testified she did not see Messenger with a gun while he was outside the house. About "a minute or two" after she stopped looking out the window, Rebecca said she heard what sounded like five gunshots. (Tr. at 239.)

{¶ 11} John Lape, Rebecca's husband, testified that around 9:00 p.m. on February 25, 2019, he heard a commotion outside and went to look out a different window than his wife. John said he saw Pack next to Samantha's car and Messenger was standing outside. He thought he heard Pack say "shoot me," and he saw Pack standing with his hands up. (Tr. at 244.) After his wife walked away from the window, John said he went to look out the window where Rebecca had been standing. By that time, John said Pack and Samantha were no longer outside but that Messenger was still standing there. John testified that he watched Messenger "[take] off on, like, eight long steps, went inside the door. The door was already open. Slammed the door and (witness clapped his hands five times). That's it." (Tr. at 246.) John testified he heard the gunshots immediately after Messenger went inside the house, and he testified he saw Messenger close the door.

{¶ 12} Breanna testified she still lived with her sister at the West Mound residence on the day of the February 25, 2019 shooting. Breanna testified that she had previously dated Messenger years earlier but that he had always been "obsessed" with Samantha. (Tr. at 277.) She stated that Messenger used to collect hair from Samantha's hairbrush and keep it in his pockets. Further, Breanna testified that her relationship with Messenger did not end well.

{¶ 13} Breanna testified that she was at the West Mound residence when the shooting occurred but that she did not see it, only "heard some things." (Tr. at 258.) However, Breanna testified that she did see the fight earlier in the day on February 25, 2019 between Pack and Messenger. Breanna said that during this fight, she saw Pack standing in front of the couch yelling at Messenger, but she did not see anyone hit anyone else.

{¶ 14} Breanna's fiancée, Wiseman, was also at the residence at this time, and she testified that she did see Pack "beating on" Messenger while Messenger sat on the couch. (Tr. at 287.) Prior to that time, Wiseman said she had never seen Pack be violent toward Messenger, but she was not surprised by his reaction given the recent revelation that

Messenger and Samantha were romantically involved. Wiseman testified the physical altercation did not appear to be serious at the time.

{¶ 15} According to Wiseman's testimony, she had let Messenger borrow her phone after his altercation with Pack, and she went to retrieve it from him later in the evening on February 25, 2019. When Messenger returned her phone, Wiseman said she saw that he had his gun on his hip. Once she was back in the basement, Wiseman said she received a phone call from Gheen asking to speak to Messenger. Wiseman testified she found Messenger again, this time outside the back door of the house, and Messenger was outside with Pack again. On cross-examination, Wiseman testified that she saw Messenger with his gun pulled out and pointed at Pack in the backyard. Wiseman said Messenger and Pack were arguing, but that she went back inside the house and returned to the basement. From the basement, Wiseman said she heard Messenger say "no, [Pack], don't," followed by "a bunch of gunshots." (Tr. at 297.) Wiseman described the gunshots as being "too many to count." (Tr. at 304.) She did not hear Pack say anything.

{¶ 16} When she heard the gunshots, Breanna said she was in the basement with Wiseman. Breanna testified that she heard Messenger say "no, [Pack], don't," followed by "way more gunshots than needed to be." (Tr. at 273.) Breanna described the gunshots as all occurring quickly without any pause in between them.

{¶ 17} After hearing the gunshots, Wiseman said Messenger yelled for her because he wanted to use her phone again. Wiseman said when she went upstairs to give Messenger her phone, she saw Messenger holding his gun, standing between Pack and the back door.

{¶ 18} The parties stipulated to the forensic evidence, including that Pack was shot 14 times. At the close of the state's evidence, defense counsel moved for an acquittal under Crim.R. 29, arguing the state had not met its burden to prove that Messenger did not act in self-defense when he shot Pack. The trial court denied the motion.

{¶ 19} Gheen testified as a witness for the defense. Gheen testified she had moved out of the West Mound residence in January 2019 and did not personally witness the events of February 25, 2019. Earlier in the day on February 25, 2019, Gheen said she repeatedly sent text messages to Pack expressing her frustration with Messenger.

{¶ 20} Messenger testified in his own defense. According to his testimony, Messenger had always had a good relationship with Pack, whom he had known since he

was eight years old, until Pack learned of Messenger's relationship with Samantha. Messenger testified that he understands that Pack had a right to be angry with him, and that he felt ashamed for betraying his stepbrother.

{¶ 21} On February 25, 2019, Messenger said he entered the West Mound residence to find Samantha and Pack together, and he could tell Samantha had been crying. Messenger testified that Pack said, "I'm going to lock this door so nobody tries to leave," which left Messenger feeling "very nervous." (Tr. at 379.) Messenger said Pack asked him to sit down on the couch and then confronted him about his suspicion that Messenger and Samantha had been "messing around" behind his back. (Tr. at 380.) Believing Pack already knew the answer, Messenger said he dropped his head in shame and could not look at Pack. When Samantha then answered the question for him, Messenger said Pack started hitting him on the left side of his face. Messenger said Pack continued to hit him until one of his young sons came in the room, at which point Pack said "I'm done. I'm not going to hit you no more." (Tr. at 381.) Samantha left the room to tend to her child, and Messenger said Pack paced back and forth while repeatedly saying "I should kill you. I should keep hitting you." (Tr. at 381.) Messenger testified that Samantha tried to leave the house but that Pack slammed the door, pushed Samantha on the couch, and told her "you're not going anywhere." (Tr. at 381.) According to Messenger, Pack then showed him the text messages he had received from Gheen revealing Messenger's and Samantha's relationship. After returning the phone to Pack, Messenger said Pack told them he was going to kill himself, and then Pack left the West Mound residence.

{¶ 22} Messenger testified that after Pack left the house, he went upstairs to get his gun because he knew Pack owned several firearms and Messenger "could tell [Pack] was upset," so he wanted to be prepared to defend himself. (Tr. at 382.) Messenger stated he did not have a concealed carry permit and he normally carried his firearm openly in a holster, but for some reason that day he placed it in the waistband of his pants. Because Pack was an armed security guard, Messenger said Pack had taught him self-defense techniques, including the quickest way to draw a firearm and how to disarm another person.

{¶ 23} "Many days prior" to Pack confronting him, Messenger testified that he believed Pack suspected Samantha was being unfaithful, and he said Pack would tell him

he would "kill the person that she left him for and then her afterwards."  (Tr. at 384.) Though Messenger admitted he did not take Pack seriously at the time he said those things, he testified that he started to feel differently after Pack hit him on February 25, 2019.  After Pack punched him, Messenger said he was afraid Pack might kill him or Samantha.

{¶ 24} Once Pack left the house, Messenger testified he called Pack multiple times to apologize and to encourage him not to take his own life.  During one of these phone calls, Messenger said Pack told him "if you have any respect for me, you need to leave [Samantha] the hell alone," and Messenger said he would, though he admitted he did not really intend to end his relationship with Samantha.  (Tr. at 387.)

{¶ 25} Later that evening, Messenger said he was in the backyard when he saw Pack climbing over the fence.  Messenger said he "immediately start[ed] backpedaling" and ran backward.  (Tr. at 387.)  According to Messenger, Pack was approaching him very quickly, so Messenger testified he drew his firearm which caused Pack to stop approaching. Messenger said Pack then approached Samantha's car and turned to Messenger to ask, "are you going to shoot me?"  (Tr. at 388.)  Messenger said he told Pack he did not want to shoot him, that Pack told him to put his gun away, and that Messenger complied and returned the gun to his waistband.

{¶ 26} Messenger testified he could not hear what Pack was saying to Samantha while she was in her car but that Pack eventually said he wanted everybody to go inside. Messenger said he did not think Samantha wanted to go inside but that he heard Pack tell her that if she did not go in the house he was going to break the windows on her car. According to Messenger, Samantha then went inside the house, and Pack asked Messenger to come inside, too.  Messenger said he told Pack "I don't want to come in the house.  I don't trust you.  I can't come in the house.  I don't feel safe."  (Tr. at 390.)  Messenger testified that he continued to resist going in the house until Pack said to him, "if you think that gun's stopping me from coming out there and getting you, you're wrong."  (Tr. at 390.) Eventually, Messenger said he agreed to go inside the house if Pack went all the way to the front door so that Messenger could maintain some distance from him and "feel safe."  (Tr. at 390.)

{¶ 27} Messenger testified that once he could see that Pack was over by the front door, Messenger went inside the house and locked the back door behind him.  During this

interaction, Messenger said he had not seen Pack carrying a gun, a knife, or a club, and he said Pack was not wearing a coat. Messenger said that Pack's youngest son was in the room and that Samantha told her son to go upstairs. Pursuant to Messenger's testimony, by the time the child went upstairs, Pack had "cut the distance we had in half already" and was standing in the middle of the room. (Tr. at 392.) Messenger said he took a step back and that Pack said he just wanted to give him a hug. Messenger said Pack had his hands out and kept approaching him, backing Messenger into a corner and repeating that he just wanted to hug Messenger. By the time Pack was within arm's reach of him, Messenger said he told him "[Pack], stop. Please stop," three or four times. (Tr. at 393.) Messenger said he believed Pack was going to attempt to take his gun because he knew Pack was trained in doing so. At that point, Messenger testified he "fire[d] [his] gun as fast as humanly possible * * * because I believe that I have waited too long at this point," and that he "was hoping in some way that [he] could stop [Pack] from taking this gun from" him. (Tr. at 393.) Messenger said that at the time he thought he had fired five or six rounds but that he has since learned he fired many more, and he also testified he did not know whether he was hitting Pack or not when he fired. On re-direct examination, Messenger testified he was no longer afraid that Pack might be armed when he was approaching him in the room, but he was afraid that Pack would try to take his own gun.

{¶ 28} Messenger admitted that he initially told the detective after the shooting that Pack may have moved back after the first shot, but he testified that he had a headache and was just trying to cooperate with police. At trial, Messenger maintained that he felt he was in danger the entire time. Messenger said he believed Pack would stop approaching when drew his gun and that he was "stunned" that Pack did not stop approaching. (Tr. at 398.) Messenger additionally testified he was trying to aim while he shot but that he was "in panic mode," and that he stopped firing once Pack fell to the ground. (Tr. at 395.) After the shooting, Messenger said Samantha called 911 and he used Wiseman's phone to call his friend. Messenger said he then placed the gun on the table for police to find and waited with his hands in the air until police arrived.

{¶ 29} On cross-examination, Messenger testified that he was still in a relationship with Samantha and that Samantha had expressed that she intended to stand by his side throughout the trial. Messenger agreed that the altercation earlier in the day on February

25, 2019 between himself and Pack was minor enough that he did not even realize he had been injured or that it left his lip bleeding, yet he maintained it was sufficient for him to be scared for his safety. Messenger testified he retrieved his gun following that altercation not because he was afraid that Pack would hit him again but because he was afraid Pack would also come back to the house with a gun. Messenger agreed he never saw Pack armed that day, that Pack never threatened to come back with a gun, that he could visibly see Pack did not have a gun unless he was concealing it in his underwear or under his t-shirt, and he said he learned after the fact that Pack did not have a gun on him at the time of the shooting. Messenger also agreed on cross-examination that Pack approached him slowly in the house with his arms out in front of him the entire time, and Messenger started shooting when Pack was just beyond arm's length away. Further, Messenger agreed he willingly went inside the house when Pack asked him to come in. He also agreed that neither Rebecca, John, nor Samantha testified that they heard Pack tell Messenger that the gun was not going to stop him from grabbing Messenger. Finally, Messenger agreed that he told police the night of the shooting that Pack went backward after the first shot but that Messenger continued to shoot until Pack fell.

{¶ 30} At the conclusion of evidence, defense counsel repeated its Crim.R. 29 motion, again arguing the state could not prove that Messenger did not act in self-defense. The trial court again denied the motion, finding reasonable minds could come to different conclusions as to whether the state proved each element beyond a reasonable doubt.

{¶ 31} Following deliberations, the jury found Messenger guilty of both counts of murder and the accompanying firearm specifications. The trial court conducted a December 5, 2019 sentencing hearing, merging the two murder counts and sentencing Messenger on Count 1, purposeful murder, to 15 years to life plus an additional 3 years on the firearm specification for an aggregate sentence of 18 years to life in prison. The trial court journalized Messenger's conviction and sentence in a December 5, 2019 judgment entry. Messenger timely appeals.

## II. Assignments of Error

{¶ 32} Messenger assigns the following errors for our review:

[1.] The trial court violated appellant's rights to due process and a fair trial when it entered a judgment of conviction based on

insufficient evidence and against the manifest weight of the evidence in violation of appellant's rights under the United States and Ohio Constitutions.

[2.] The trial court erred in admitting victim-impact photographs of the deceased with his family and in his security guard uniform thereby depriving appellant of his rights to due process and a fair trial.

[3.] Appellant was denied his rights to the presumption of innocence, to a fair trial and to due process contrary to the Ohio and United States Constitutions when the jury heard evidence of appellant's incarceration prior to trial.

[4.] Appellant was deprived of the effective assistance of trial counsel in violation of appellant's rights under the Sixth and Fourteenth Amendments to the United States Constitution, and Section 10 and 16, Article I of the Ohio Constitution.

## III.  First Assignment of Error – Sufficiency and Manifest Weight of the Evidence

{¶ 33} In his first assignment of error, Messenger argues there was insufficient evidence to support his murder conviction and that his conviction is against the manifest weight of the evidence.

### A.  Sufficiency of the Evidence

{¶ 34} Whether there is legally sufficient evidence to sustain a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). Sufficiency is a test of adequacy. *Id.* The relevant inquiry for an appellate court is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime proven beyond a reasonable doubt. *State v. Mahone*, 10th Dist. No. 12AP-545, 2014-Ohio-1251, ¶ 38, citing *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, ¶ 37.

{¶ 35} Messenger argues the state presented insufficient evidence to sustain his murder conviction. However, Messenger does not argue the state failed to produce evidence on all the essential elements of murder as contained in R.C. 2903.02; rather, he asserts that the state failed to disprove his claim that he shot and killed Pack in self-defense.

{¶ 36} Prior to March 28, 2019, Ohio law deemed self-defense an affirmative defense, requiring a defendant to prove the elements of self-defense by a preponderance of the evidence. *See, e.g., State v. Lindsey*, 10th Dist. No. 14AP-751, 2015-Ohio-2169, ¶ 45, citing *State v. Martin*, 21 Ohio St.3d 91, 93 (1986). Effective March 28, 2019, however, following revisions to R.C. 2901.05, a defendant no longer bears the burden of establishing the elements of self-defense by a preponderance of the evidence. R.C. 2901.05(B)(1); *see also State v. Carney*, 10th Dist. No. 19AP-402, 2020-Ohio-2691, ¶ 31. Instead, the self-defense statute now "place[s] the burden on the prosecution to disprove at least one of the elements of self-defense beyond a reasonable doubt." *Carney* at ¶ 31. Specifically, R.C. 2901.05(B)(1) provides:

> A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

Thus, the current version of R.C. 2901.05(B)(1) requires the state "to disprove self-defense by proving beyond a reasonable doubt that [the defendant] (1) was at fault in creating the situation giving rise to the affray, OR (2) did not have a bona fide belief that he was in imminent danger of death or great bodily harm for which the use of deadly force was his only means of escape, OR (3) did violate a duty to retreat or avoid the danger." *Carney* at ¶ 31; *see also State v. Daley*, 10th Dist. No. 19AP-561, 2020-Ohio-4390, ¶ 39.

{¶ 37} Due to this recent change in the self-defense law, the parties dispute whether it is appropriate to consider self-defense under a sufficiency of the evidence review. The state agrees that it is now charged with disproving self-defense at trial, but it argues a sufficiency of the evidence review focuses only on the essential or substantive elements of a crime rather than affirmative defenses. In support, the state relies on this court's decision in *State v. Parker*, 10th Dist. No. 18AP-990, 2019-Ohio-3908, which held that an appellant could not "challenge the trial court's rejection of his self-defense claim on sufficiency of the

evidence grounds" because self-defense is an affirmative defense, and a claim of insufficient evidence challenges the sufficiency of the state's evidence but does not consider the strength of defense evidence. *Parker* at ¶ 12, citing *State v. Gripper*, 10th Dist. No. 12AP-396, 2013-Ohio-2740, ¶ 24, and *State v. Rankin*, 10th Dist. No. 10AP-1118, 2011-Ohio-5131, ¶ 17 (stating "[t]he 'due process "sufficient evidence" guarantee does not implicate affirmative defenses, because proof supportive of an affirmative defense cannot detract from proof beyond a reasonable doubt that the accused had committed the requisite elements of the crime' ").

{¶ 38} The state recognizes that *Parker* and the cases on which it relies predate the March 28, 2019 change to Ohio's self-defense law. Nonetheless, the state asserts the logic of *Parker* should still apply because, despite the change to R.C. 2901.05(B)(1) requiring the state to disprove that a defendant acted in self-defense, the General Assembly continues to classify self-defense as an affirmative defense in R.C. 2901.05(A). Thus, the state asserts a sufficiency of the evidence challenge to Messenger's murder conviction should entail a review of only the essential elements of the offense of murder as contained in R.C. 2903.02 without additional consideration of whether the state sufficiently proved Messenger did not act in self-defense under R.C. 2901.05(B). *See Parker* at ¶ 12; *State v. Jennings*, 10th Dist. No. 05AP-1051, 2006-Ohio-3704, ¶ 28 (finding a sufficiency of the evidence review did not apply to the affirmative defense of insanity because "proof supportive of an affirmative defense cannot detract from proof beyond a reasonable doubt that the accused had committed the requisite elements of the crime," and the insanity defense "does not involve the substantive elements of the criminal offense"), citing *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, ¶ 37-38.

{¶ 39} Messenger responds that the continued categorization of self-defense as an affirmative defense is irrelevant given the explicit statutory language now requiring the state to disprove self-defense. Stated another way, Messenger asserts *Parker* and other pre-March 28, 2019 cases are no longer applicable as the burden is now on the state to prove Messenger did not act in self-defense. Indeed, this court in *Parker* acknowledged in a footnote that the March 28, 2019 amendment to the self-defense statute "could change the sufficiency analysis." *Parker* at ¶ 12, fn. 2. Messenger also notes that this court has considered an appellant's sufficiency of the evidence challenge to a claim of self-defense in

a case dealing with the post-March 28, 2019 version of R.C. 2901.05(B)(1). *Carney* at ¶ 32 (concluding the state presented sufficient evidence to disprove self-defense).

{¶ 40} We are mindful of our previous decision in *Carney* considering a sufficiency of the evidence challenge to the current version of R.C. 2901.05(B)(1). However, Messenger's argument ignores that even despite the shifting of the burden of proof on the affirmative defense, a review of the sufficiency of the evidence " 'must be applied with explicit reference to the *substantive elements of the criminal offense as defined by state law*.' " (Emphasis sic.) *Hancock* at ¶ 38, quoting *Jackson v. Virginia*, 443 U.S. 307, 324 (1979), fn. 16. Though *Carney* applied a sufficiency of the evidence challenge to the current version of R.C. 2901.05(B)(1) based on the burden-shifting language in the statute, *Carney* assumed the sufficiency of the evidence review applied but did not consider the precise question here: whether the burden-shifting language renders the absence of self-defense an essential element of the charged offense such that it is, indeed, appropriate for a sufficiency of the evidence review.

{¶ 41} Notably, the Supreme Court of Ohio has expressly held that "the due process 'sufficient evidence' guarantee does not implicate affirmative defenses, because proof supportive of an affirmative defense cannot detract from proof beyond a reasonable doubt that the accused had committed the requisite elements of the crime." (Internal quotations omitted.) *Hancock* at ¶ 37. We recognize that *Hancock* predates the current version of Ohio's self-defense statute. However, a careful review of *Hancock* and the cases upon which it relies leads us to conclude that *Hancock* still applies to the current statutory framework of R.C. 2901.05 and its treatment of self-defense as an affirmative defense.

{¶ 42} In reaching its conclusion that a review of the sufficiency of the evidence does not apply to affirmative defenses, the Supreme Court of Ohio in *Hancock* found persuasive the logic of the United States Court of Appeals for the Sixth Circuit in *Allen v. Redman*, 858 F.2d 1194 (6th Cir.1988). In *Allen*, the Sixth Circuit considered the question of "whether, in Michigan, when the defendant introduces evidence of insanity, proof of sanity becomes an element of the offense charged." *Allen* at 1197. Under Michigan law, once a defendant introduces some evidence of insanity, the burden of proof shifts to the prosecution to prove sanity beyond a reasonable doubt. *Id.*, citing *People v. Murphy*, 416 Mich. 453, 463-64 (1982). The defendant argued that it must follow that sanity becomes an "element" of the

charged offense for due process purposes once a defendant introduces evidence required to shift the burden to the state. However, the Sixth Circuit rejected the defendant's argument and found that a state's "mere acceptance of the burden of proof" on the affirmative defense does not transform the affirmative defense into an element of the charged offense. *Allen* at 1197, citing *Engle v. Isaac*, 456 U.S. 107, 120-21 (concluding a state may elect to carry the burden of proof on a defendant's properly raised affirmative defense without designating the absence of the defense an element of the crime). The *Allen* court noted that unless a criminal offense statute specifically included sanity as an element of the offense, the burden-shifting triggered by a defendant's introduction of evidence of insanity as an affirmative defense did not operate to transform sanity into an element of the offense. *Allen* at 1199-1200.

{¶ 43} Applying the reasoning of *Allen* and *Hancock*, there is nothing in the current version of R.C. 2901.05(B)(1) indicating that by shifting the burden of proof on the affirmative defense of self-defense, the General Assembly intended to transform the absence of self-defense into an essential element of a criminal offense. Moreover, there is nothing in the statutory definition of murder as charged in R.C. 2903.02 indicating the absence of self-defense is an element of the offense. *See State v. McCall*, 10th Dist. No. 18AP-932, 2021-Ohio-1032, ¶ 20 (noting "R.C. 2903.02(A) provides that '[n]o person shall purposely cause the death of another' "). Instead, the structure of R.C. 2901.05 contemplates the proof required for "all elements of the offense" as separate and distinct from the poof required for an affirmative defense even where the state bears the burden of disproving the affirmative defense. R.C. 2901.05(A) and (B)(1). Where the General Assembly has chosen not to explicitly designate the absence of self-defense as contained in R.C. 2901.05(B)(1) an essential element of the charged offense, we decline to implicitly read such a designation into the statute.

{¶ 44} It is also relevant that, in describing the difference between sufficiency of the evidence and manifest weight of the evidence, this court has previously explained that "[a] challenge to the sufficiency of the evidence involves the prosecution's *burden of production*, while a challenge to the weight of the evidence involves the prosecution's burden of persuasion." (Emphasis added.) *State v. Petty*, 10th Dist. No. 11AP-716, 2012-Ohio-2989, ¶ 23. *See also State v. Ward*, 10th Dist. No. 10AP-430, 2011-Ohio-608, ¶ 6 ("[a] challenge

to the sufficiency of the evidence supporting a conviction requires a court to determine whether the state has met its burden of production at trial"), citing *Thompkins* at 390. Under the current version of R.C. 2901.05, while the burden of *proof* for the affirmative defense of self-defense has shifted to the state, the burden of *production* for all affirmative defenses, including self-defense, remains with the defendant. *See State v. Parrish*, 1st Dist. No. C-190379, 2020-Ohio-4807, ¶ 14 ("the recent changes to R.C. 2901.05 * * * [do] not change the accused's burden of production with respect to self-defense"); *State v. Petway*, 11th Dist. No. 2019-L-124, 2020-Ohio-3848, ¶ 55 ("[u]nder the amended statute, the defendant retains the burden of production, which is the burden of producing evidence that 'tends to support' that the defendant used the force in self-defense," while "[t]he burden of persuasion has been shifted to the prosecution to disprove at least one of the elements of self-defense beyond a reasonable doubt"). Thus, if the state does not bear the burden of production on self-defense, it follows that sufficiency of the evidence is not the proper framework to review whether the state proved the absence of self-defense.

{¶ 45} This conclusion does not leave Messenger without an avenue to challenge the state's proof relative to his claim of self-defense. Though a review under the sufficiency of the evidence is not appropriate, Messenger's argument nonetheless presents a challenge to the manifest weight of the evidence. *See State v. Ferrell*, 10th Dist. No. 19AP-816, 2020-Ohio-6879, ¶ 54 (in a case involving the post-March 28, 2019 version of the self-defense statute, appellant's argument that there was insufficient evidence to sustain his murder conviction did not assert that the state failed to produce evidence to establish all the essential elements of the offense; instead, he argued the evidence established he acted in self-defense which presented a challenge to the manifest weight of the evidence rather than the sufficiency of the evidence), citing *State v. Kurtz*, 10th Dist. No. 17AP-382, 2018-Ohio-3942, ¶ 21; *Petty* at ¶ 23. Accordingly, we will consider Messenger's argument that the state failed to prove he did not act in self-defense as a challenge to the manifest weight of the evidence.

{¶ 46} Having reviewed the record, we find there was sufficient evidence to support Messenger's conviction of murder.

### B.  Manifest Weight of the Evidence

{¶ 47} When presented with a manifest weight argument, an appellate court engages in a limited weighing of the evidence to determine whether sufficient competent, credible evidence supports the jury's verdict.  *State v. Salinas*, 10th Dist. No. 09AP-1201, 2010-Ohio-4783, ¶ 32, citing *Thompkins* at 387.  "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony."  *Thompkins* at 387, quoting *Tibbs v. Florida*, 457 U.S. 31, 42 (1982).  Determinations of credibility and weight of the testimony are primarily for the trier of fact.  *State v. DeHass*, 10 Ohio St.2d 230 (1967), paragraph one of the syllabus.  Thus, the jury may take note of the inconsistencies and resolve them accordingly, "believ[ing] all, part, or none of a witness's testimony."  *State v. Raver*, 10th Dist. No. 02AP-604, 2003-Ohio-958, ¶ 21, citing *State v. Antill*, 176 Ohio St. 61, 67 (1964).

{¶ 48}  An appellate court considering a manifest weight challenge "may not merely substitute its view for that of the trier of fact, but must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."  *State v. Harris*, 10th Dist. No. 13AP-770, 2014-Ohio-2501, ¶ 22, citing *Thompkins* at 387.  Appellate courts should reverse a conviction as being against the manifest weight of the evidence only in the most " 'exceptional case in which the evidence weighs heavily against the conviction.' "  *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983).

{¶ 49} Messenger argues his conviction is against the manifest weight of the evidence because the jury clearly lost its way in not believing his claim of self-defense.  Essentially, Messenger asserts that his testimony demonstrates he acted in self-defense and the state did not convincingly prove otherwise.  However, a conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version.  *Lindsey* at ¶ 43 (rejecting defendant's argument that his conviction was against the manifest weight of the evidence because the jury did not believe his claim of self-defense), citing *State v. Gale*, 10th Dist. No. 05AP-708, 2006-Ohio-1523,

¶ 19. As we noted above, the trier of fact remains free to believe "all, part, or none of a witness's testimony." *Raver* at ¶ 21.

{¶ 50} The state is required to disprove only one of the elements of self-defense beyond a reasonable doubt in order to sufficiently disprove a defendant's claim of self-defense. Here, though Messenger asserts Pack was at fault in creating the situation giving rise to the affray by climbing over the fence in the back yard, Messenger admitted in his testimony that he voluntarily chose, while armed, to follow Pack into the house after their earlier physical altercation and their more recent verbal exchange in the yard. *See State v. Ellis*, 10th Dist. No. 11AP-939, 2012-Ohio-3586, ¶ 16 (a jury may properly find appellant at fault for the situation giving rise to the affray where appellant chose to enter a place where he knew the victim would be despite knowing that a confrontation might ensue and in choosing to follow the victim out of the store and engage in a further confrontation outside instead of staying inside the store and walking away from the volatile situation). Though Messenger testified he felt he had no choice but to follow Pack into the house because of his allegation that Pack told him the presence of his gun would not stop Pack from grabbing Messenger and forcing him into the house, we note that none of the other witnesses testified to hearing Pack say such a thing.

{¶ 51} Additionally, by Messenger's own testimony, he first pulled a gun on Pack while outside the house and then again pulled his gun while Pack was walking slowly toward him inside the house. Even believing Messenger's testimony on this point despite no other witness testifying to having seen Messenger point his gun at Pack while outside the house, Messenger ignores that by brandishing his gun, he escalated the conflict. *Ellis* at ¶ 16 ("appellant escalated the conflict by announcing in the store that he was carrying a gun"); *Ferrell* at ¶ 30 (noting that appellant's argument that placing his gun against the victim's head should have served as his intention to retreat from the initial encounter ignores that by brandishing his gun, appellant only escalated the situation).

{¶ 52} Even if we were to agree with Messenger that the state did not prove that he was at fault at creating the situation giving rise to the affray, we cannot find that the jury clearly lost its way in finding that Messenger did not have a reasonable and honest belief that he was in imminent danger of death or great bodily harm and his only means of escape was in the use of deadly force. By Messenger's own testimony, in the moments when he

was standing inside the house and Pack started to walk toward him, Messenger did not fear that Pack, himself, was armed. Instead, Messenger claimed he was afraid that Pack would approach him and disarm him since, he claimed, Pack was trained in how to disarm an individual. The jury could have concluded from Messenger's testimony, alone, that Messenger's fear of being disarmed was not reasonable and/or that shooting Pack 14 times was not Messenger's only means of escape. Additionally, John testified that Messenger walked deliberately into the house, slammed the door, and immediately started firing his gun. John's testimony supports the state's argument that Messenger came into the house in an angry rage with the purpose of killing Pack, again undercutting Messenger's assertion that he was not at fault for the situation and that he had a reasonable and honest belief that he was in imminent danger of death or great bodily harm.

{¶ 53} Thus, in light of the evidence discussed above, as well as the record in its entirety, we do not find the jury clearly lost its way in concluding the state proved that Messenger did not act in self-defense when he shot and killed Pack. We conclude, therefore, that the manifest weight of the evidence supports Messenger's conviction of murder. Accordingly, we overrule Messenger's first assignment of error.

## IV. Second Assignment of Error – Admission of Photographs

{¶ 54} In his second assignment of error, Messenger argues the trial court erred in admitting into evidence photographs of Pack with his family and in his security guard uniform. Generally, the admission or exclusion of evidence lies in the sound discretion of the trial court, and we will not disturb that decision absent an abuse of discretion. *State v. Darazim*, 10th Dist. No. 14AP-203, 2014-Ohio-5304, ¶ 16, citing *State v. Issa*, 93 Ohio St.3d 49, 64 (2001). An abuse of discretion implies that the court's attitude was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶ 55} Messenger's argument under this assignment of error relates to three photographs. One photograph showed Pack with his father and sisters, another photograph showed Pack in his security guard uniform, and the third was a photograph of Pack's body at the scene of the shooting. Messenger asserts these photographs were unfairly prejudicial.

{¶ 56} Evid.R. 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." However, Evid.R.

403(A) provides that "[a]lthough relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury."

{¶ 57} As to the photographs showing Pack while he was still alive, Messenger argues that any potential probative value of the photographs was minimal as there was no dispute about the identity of the parties or the cause of death. Thus, Messenger asserts the photographs are unfairly prejudicial because they serve mostly to engender sympathy for the victim from the jury. However, Messenger does not specify any prejudice beyond his claim that the photographs humanize the victim, and he does not articulate how the admission of the photographs resulted in any material prejudice. *State v. Hughes*, 10th Dist. No. 14AP-360, 2015-Ohio-151, ¶ 41, quoting *Darazim* at ¶ 16 (stating " '[a] trial court has broad discretion over the admission or exclusion of evidence, and a reviewing court generally will not reverse an evidentiary ruling absent an abuse of discretion that materially prejudices the affected party' "). As to the photograph showing Pack's body, the location of the body relative to where Messenger claimed to be standing during the shooting was relevant to determining how the events unfolded. We find the probative value from these photographs outweighs any potential prejudice. *See State v. Jones*, 10th Dist. No. 18AP-33, 2019-Ohio-2134, ¶ 34-35 (finding no error in admission of photographs of victim's severe burn injuries, noting "[t]hat the photographs may be gruesome does not render them inadmissible if they otherwise satisfy the balancing test of Evid.R. 403(A)").

{¶ 58} Because the trial court did not abuse its discretion in admitting the contested photographs into evidence, we overrule Messenger's second assignment of error.

## V. Third Assignment of Error – Evidence of Messenger's Incarceration

{¶ 59} In his third assignment of error, Messenger argues the trial court erred in admitting evidence of his incarceration prior to trial. More specifically, Samantha testified she continued to visit Messenger while he was in jail awaiting trial, and the state introduced a record of her 59 visits with Messenger between March 4 and October 28, 2019. Messenger asserts this evidence interfered with his presumption of innocence. As Messenger concedes, however, his counsel did not object to this evidence at trial, and thus our review is limited to plain error. *Hughes* at ¶ 28, citing *State v. Jackson*, 92 Ohio St.3d 436, 444 (2001), citing *State v. Underwood*, 3 Ohio St.3d 12 (1983), syllabus; Crim.R. 52(B). An

appellate court recognizes plain error with the utmost caution, under exceptional circumstances, and only to prevent a miscarriage of justice. *State v. Pilgrim*, 184 Ohio App.3d 675, 2009-Ohio-5357, ¶ 58 (10th Dist.), citing *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, ¶ 139.

{¶ 60} For an error to be a "plain error" under Crim.R. 52(B), it must satisfy three prongs: (1) there must be an error, meaning a deviation from a legal rule, (2) the error must be "plain," meaning an "obvious" defect in the trial proceedings, and (3) the error must have affected "substantial rights," meaning the error must have affected the outcome of the trial. *State v. Barnes*, 94 Ohio St.3d 21, 27 (2002).

{¶ 61} Messenger argues the admission of the evidence of Samantha's many visits with Messenger while he was incarcerated prior to trial was not relevant and was unfairly prejudicial, serving only to erode his presumption of innocence. However, the state introduced this evidence to demonstrate that Samantha and Messenger were still in a romantic relationship and to cast doubt on her assertion that she had not discussed the trial or her planned testimony with Messenger prior to trial. Though Messenger argues the potential evidentiary value of informing the jury of the frequency of Messenger's and Samantha's communication does not outweigh the prejudice it caused him by the jury learning of his incarceration, the trial court fully explained the presumption of innocence in the jury instructions. "A jury is presumed to follow a trial court's instructions." *Jones* at ¶ 64 (noting that "[e]vidence about a defendant's arrest and ensuing custody does not contravene the presumption of innocence," and "[w]hile no specific curative instruction was requested or provided, the trial court fully explained the presumption of innocence in the jury instructions"), citing *State v. Williams,* 99 Ohio St.3d 439, 2003-Ohio-4164, ¶ 75, and *State v. Trewartha*, 10th Dist. No. 05AP-513, 2006-Ohio-5040, ¶ 21. Thus, Messenger cannot demonstrate any error, let alone plain error, from the admission of this evidence. We overrule Messenger's third assignment of error.

## VI. Fourth Assignment of Error – Ineffective Assistance of Counsel

{¶ 62} In his fourth and final assignment of error, Messenger argues he received the ineffective assistance of counsel. More specifically, Messenger asserts his counsel was ineffective in failing to make or renew certain evidentiary objections throughout the trial

and in allowing the coroner to appear as the last witness at trial after Messenger testified in during the defense's case.

{¶ 63} In order to prevail on a claim of ineffective assistance of counsel, Messenger must satisfy a two-prong test. First, he must demonstrate that his counsel's performance was deficient. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). This first prong requires Messenger to show that his counsel committed errors which were "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* If Messenger can so demonstrate, he must then establish that he was prejudiced by the deficient performance. *Id.* To show prejudice, Messenger must establish there is a reasonable probability that, but for his counsel's errors, the result of the trial would have been different. A "reasonable probability" is one sufficient to undermine confidence in the outcome of the trial. *Id.* at 694.

{¶ 64} In considering claims of ineffective assistance of counsel, courts indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. *State v. Conway*, 109 Ohio St.3d 412, 2006-Ohio-2815, ¶ 101. Messenger contends his trial counsel was ineffective in (1) failing to renew its objection to the admission of photographs of Pack; (2) failing to object to evidence of his pre-trial incarceration; (3) failing to object to evidence of a search warrant; (4) failing to object to the coroner testifying out of order and appearing as the last witness at trial; (5) failing to object to repetitive photographs of Pack; (6) failing to object to lay opinion testimony; (7) failing to object to evidence of the character and conduct of a witness; and (8) failing to object to evidence of Messenger owning multiple guns. Additionally, Messenger asserts the cumulative effect of counsel's alleged errors rendered his trial counsel ineffective.

## A. Objections to Admission of Photographs

{¶ 65} Messenger's first allegation of ineffective assistance of counsel is his trial counsel's failure to renew its objection to the photographs discussed in his second assignment of error. To succeed on a claim of ineffective assistance of counsel based on counsel's failure to file an objection, an appellant must demonstrate that the objection had a reasonable probability of success. *Jones* at ¶ 52, citing *State v. Johns*, 10th Dist. No. 11AP-203, 2011-Ohio-6823, ¶ 25. If the objection would not have been successful, the appellant cannot prevail on a claim of ineffective assistance of counsel. *Id.*, citing *Johns* at ¶ 25.

{¶ 66} However, we determined in our resolution of Messenger's second assignment of error that the trial court did not abuse it discretion in admitting the photographs into evidence. Thus, a renewed objection to the admission of these photographs did not have a reasonable probability of success, and Messenger's counsel was not deficient in failing to renew that objection.

### B. Objection to Evidence of Incarceration

{¶ 67} Messenger's second allegation of ineffective assistance of counsel is his trial counsel's failure to object to the evidence of his pre-trial incarceration. This argument reflects the argument Messenger made under his third assignment of error on appeal. Though we reviewed Messenger's third assignment of error under a plain error standard, we determined in resolving his third assignment of error that the admission of the evidence of Messenger's pre-trial incarceration was not error, let alone plain error. Thus, an objection as to the admissibility of this evidence would not have been successful, and Messenger's trial counsel was not deficient in failing to object to the admissibility of the evidence. *Jones* at ¶ 52, citing *Johns* at ¶ 25.

### C. Objection to Evidence of Search Warrant

{¶ 68} Messenger's third allegation of ineffective assistance is his trial counsel's failure to object to evidence of a search warrant, arguing it interfered with his presumption of innocence. However, an objection on these grounds was unlikely to be successful for the same reason an objection related to evidence of Messenger's pre-trial incarceration was unlikely to be successful. *See Jones* at ¶ 64. Additionally, trial counsel's decision not to object to the admission of the search warrant was likely a strategic decision to not call attention to the search warrant affidavit as it only highlighted the state's evidence against Messenger and did not aid in his claim of self-defense. Strategic and tactical decisions of trial counsel, even if ultimately unsuccessful, cannot form the basis of a claim of ineffective assistance of counsel. *Columbus v. Oppong*, 10th Dist. No. 15AP-1059, 2016-Ohio-5590, ¶ 30, citing *State v. Harris*, 10th Dist. No. 15AP-683, 2016-Ohio-3424, ¶ 61.

### D. Coroner's Testimony After Defense Case

{¶ 69} Messenger's fourth allegation of ineffective assistance of counsel is his trial counsel's failure to object to the order of witnesses. More specifically, the deputy coroner who conducted Pack's autopsy became ill during the trial and was unable to testify as

originally planned. The parties stipulated to the autopsy report and, when the state rested its case-in-chief, the state reserved the right to recall the deputy coroner if he were available. The next day, prior to Messenger's testimony, the state indicated the deputy coroner was still ill and indicated it would call a different deputy coroner to testify after reviewing the relevant documentation. Defense counsel did not object to this arrangement, and the substitute deputy coroner testified after Messenger testified in his own defense.

{¶ 70} Messenger now argues the lack of objection to this out-of-order testimony amounted to deficient performance, asserting the only reasonable strategy was to have Messenger be the last witness to testify. However, Messenger's trial counsel made the strategic decision to be accommodating to the trial court's schedule and did not object to the order of witnesses. This decision, a matter of trial strategy, does not support Messenger's claim of ineffective assistance of counsel. *Oppong* at ¶ 30. Additionally, Messenger does not articulate any prejudice resulting from this strategic decision.

### E. Objections to Repetitive Photographs and Videos

{¶ 71} Messenger's fifth allegation of ineffective assistance of counsel is his trial counsel's failure to object to what he classifies as repetitive photographs and videos of Pack and the scene of the shooting. Again, however, Messenger does not show that an objection would have been successful, nor does he articulate what prejudice resulted from his trial counsel's failure to object.

### F. Objection to Lay Opinion Testimony

{¶ 72} Messenger's sixth allegation of ineffective assistance of counsel is his trial counsel's failure to object to what he deems impermissible lay opinion testimony. Specifically, Messenger asserts his trial counsel was deficient in failing to object to Breanna's testimony that Messenger fired his gun "way more" times than he needed to. (Tr. at 273.) However, Messenger again does not demonstrate a reasonable likelihood that the results would have been different had his trial counsel objected to this testimony. There was ample other evidence that Messenger fired his gun many times, including the autopsy report that 14 bullets struck Pack. Thus, the lack of an objection to this testimony does not satisfy the second prong of the *Strickland* test.

### G. Objection to Evidence of Character and Conduct of a Witness

{¶ 73} Messenger's seventh allegation of ineffective assistance of counsel is his trial counsel's failure to object to what he deems impermissible character and conduct evidence regarding a witness. More specifically, Messenger asserts his trial counsel should have objected when Rebecca testified that she knew Pack from the time he moved in the house next door because Pack knocked on her door in the overnight hours saying Samantha had beat him up. Messenger asserts this testimony violated Evid.R. 608(A) as it was evidence of Samantha's reputation or character for truthfulness but that no party claimed Samantha testified untruthfully. Thus, he argues his trial counsel should have objected to its admission. However, when read in context, the contested testimony was not used to impeach Samantha's credibility or otherwise offer an opinion on her character. Instead, the testimony established how long Rebecca had known Pack. Accordingly, Messenger cannot show either that an objection would have been sustained or that he suffered any prejudice from the admission of this testimony. The lack of objection to Rebecca's testimony does not substantiate a claim of ineffective assistance of counsel.

### H. Objection to Evidence of Messenger's Gun Ownership

{¶ 74} Messenger's eighth allegation of ineffective assistance of counsel is his trial counsel's failure to object to Wiseman's testimony that she had seen several of Messenger's guns at the West Mound residence. Messenger asserts this testimony suggested to the jury that he was generally dangerous. However, Messenger, himself, testified to frequently carrying a gun openly due to lack of a concealed carry permit. He does not articulate how Wiseman's testimony that he had more than one gun caused him any specific prejudice, nor does he explain how his ownership of multiple firearms undercuts his claim of self-defense. Accordingly, his trial counsel was not deficient in failing to object to Wiseman's testimony.

### I. Cumulative Effect of Errors

{¶ 75} Messenger finally argues that even if we conclude none of the above alleged errors are sufficient to find ineffective assistance of counsel standing alone, the cumulative effect of these errors nonetheless resulted in Messenger being denied a fair trial.

{¶ 76} Messenger relies on *State v. DeMarco*, 31 Ohio St.3d 191 (1987), for the proposition that although errors at trial singularly "may not rise to the level of prejudicial error, a conviction will be reversed where the cumulative effect of the errors deprives a

defendant of the constitutional right to a fair trial." *Id.* at paragraph two of the syllabus. Messenger urges us to conclude that his trial counsel's many alleged errors, when considered together, deprived him of a fair trial.

{¶ 77} In considering Messenger's eight alleged instances of ineffective assistance of counsel, we noted that many of his allegations failed to satisfy the first prong of the *Strickland* test and did not rise to the level of deficient performance. Moreover, even if we were to agree with Messenger that his counsel's overall performance was deficient under the first prong of *Strickland*, we are constrained by the second prong of *Strickland* which requires Messenger to demonstrate that but for his counsel's performance, the outcome of the proceedings would have been different. Here, the sole issue at trial was whether Messenger acted in self-defense. None of Messenger's allegations of ineffective assistance of counsel cast doubt on that central question. Although Messenger complains about his trial counsel's various failures to object to certain evidence, he does not articulate how any of those objections would have caused the jury to reach a different conclusion as to whether he shot Messenger in self-defense. Thus, because Messenger is unable to demonstrate the requisite prejudice under the second prong of *Strickland*, the cumulative effect of the alleged errors did not deprive him of a fair trial. *Hughes* at ¶ 74.

{¶ 78} For these reasons, Messenger is unable to demonstrate he received the ineffective assistance of counsel. We overrule Messenger's fourth and final assignment of error.

## VII. Disposition

{¶ 79} Based on the foregoing reasons, the sufficiency of the evidence and the manifest weight of the evidence support Messenger's conviction of murder, the trial court did not abuse its discretion or plainly err in its evidentiary rulings, and Messenger did not receive the ineffective assistance of counsel. Having overruled Messenger's four assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas.

*Judgment affirmed.*

BROWN and KLATT, JJ., concur.

———————————