[Cite as *State v. Chappell*, 2024-Ohio-1895.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                           :

    Plaintiff-Appellee,           :

                                          No. 112935

    v.                                        :

KATIA CHAPPELL,                          :

    Defendant-Appellant.          :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** May 16, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-22-666844-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Chadwick Cleveland and Kristin M. Karkutt, Assistant Prosecuting Attorneys, *for appellee.*

Russell S. Bensing, *for appellant.*

MICHAEL JOHN RYAN, J.:

{¶ 1} Defendant-appellant, Katia Chappell ("Chappell"), appeals her conviction in the shooting death of Dominique Johnson ("Johnson") and shooting of Rebecca Patterson ("Patterson"), which was rendered after a jury trial. For the reasons that follow, we affirm.

{¶ 2} In 2022, Chappell was charged in a ten-count indictment with the following:

> Count 1: aggravated murder, an unclassified felony, in violation of R.C. 2903.01(A), with one- and three-year firearm specifications.
>
> Count 2: murder, an unclassified felony, in violation of R.C. 2903.02(A), with one- and three-year firearm specifications.
>
> Count 3: murder, an unclassified felony, in violation of R.C. 2903.02(B), with one- and three-year firearm specifications.
>
> Count 4: attempted murder, a felony of the first degree, in violation of R.C. 2923.02/2903.02(A), with one- and three-year firearm specifications.
>
> Count 5: felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(1), with one- and three-year firearm specifications.
>
> Count 6: felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(2), with one- and three-year firearm specifications.
>
> Count 7: felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(1), with one- and three-year firearm specifications.
>
> Count 8: felonious assault, a felony of the second degree, in violation of R.C. 2903.11(A)(2), with one- and three-year firearm specifications.
>
> Count 9: tampering with evidence, a felony of the third degree, in violation of R.C. 2921.12(A)(1).
>
> Count 10: carrying a concealed weapon, a felony of the fourth degree, in violation of R.C. 2923.12(A)(2).

{¶ 3} Prior to the start of trial, the state offered Chappell a plea deal, which would have allowed her to plead guilty to one count of voluntary manslaughter with a three-year firearm specification, one count of felonious assault, and one count of tampering with evidence with a possible indefinite sentence of 6–25 years in prison.

Chappell rejected the plea offer, and the matter proceeded to a jury trial. At the conclusion of trial, the jury returned a verdict of guilty on all charges, including specifications. At her sentencing hearing, the court found that Counts 1, 2, 3, 5, and 6 and then Counts 4, 7, and 8 were allied offenses and therefore merged for sentencing purposes. The court sentenced Chappell to life without the possibility of parole for 25 years for merged Counts 1, 2, 3, 5, and 6, with a three-year firearm specification from Count 1 and a three-year firearm specification from Count 4 to be served consecutive with and prior to her underlying offenses. The court sentenced Chappell to 11 years on Count 4 to be served concurrent to the sentences for Count 1 and Count 10 and ordered that she be sentenced to time served on Count 9. Thus, the court sentenced Chappell to life in prison with parole eligibility after 31 years.

{¶ 4} The following evidence was adduced at trial.

{¶ 5} Chappell was employed at Springco, an industrial plant in Cleveland, Ohio. On November 25, 2021, Chappell worked third shift. Springco had an unusual work environment: employees and their friends, who seemingly could come and go at will even though they were not employed by the company, would drink alcohol, smoke marijuana, and have sex while working or visiting the company; these activities were especially prevalent during third shift. What was not allowed at the plant, however, were firearms. Witness testimony and exhibits entered into evidence at trial established that Springco prohibited anyone from carrying firearms into the building. Despite that rule, it is undisputed that Chappell had a firearm in

her purse, which she admitted she concealed and brought into the plant on the night of the shooting; according to Chappell, she always carried her gun for protection.

{¶ 6} Patterson was also working this night. It was Thanksgiving and Patterson was drinking; she testified she drank three to six Twisted Teas over the course of her shift. Patterson and Chappell had a history of not liking each other. According to Patterson, Chappell had threatened to hit her the night before. Patterson complained to management that Chappell threatened her. Patterson was advised to try and stay out of the drama.

{¶ 7} Patterson testified that Chappell also did not get along with Johnson. Johnson used to work at Springco but was fired after a dispute with Chappell about a man; Chappell had been fired also at one point but was rehired. It was also alleged that Chappell and her cousin, Alice "Anna" Legg (who did not work at Springco but was often there), followed Johnson around a Walmart a few months prior to the shooting. Multiple witnesses, including defense witnesses, testified that Chappell had a "beef" with Johnson.

{¶ 8} The evening of the shooting, Patterson and Chappell were arguing back and forth during their shift. Legg was visiting her cousin at the plant. According to Patterson, Legg joined in the arguing by making threats and rolling her eyes. Patterson repeatedly asked Chappell to leave her alone but Chappell continued to harass her.

{¶ 9} During this time, Patterson was exchanging text messages with Johnson, describing what was going on. Eventually Patterson asked Johnson to pick

her up. Patterson explained that if Chappell was going to bring other people into the situation, i.e. Legg, then she would too. Johnson replied, via text message, that "if I pull up, imma shoot that hoe." Patterson replied that she would "get this whole place shot up with one phone call. Leave me alone, like stop," referring to the harassment by Chappell and Legg.

{¶ 10} During her testimony, Patterson clarified that she did not actually intend to shoot up her place of employment and was not carrying a weapon, but that she and Johnson were texting in that manner because Chappell would not stop taunting Patterson and she was irritated and ready to go home.

{¶ 11} Johnson drove to Springco and brought along Patterson's sister, Barbara. When they arrived, Barbara got out of Johnson's car and headed inside the plant to get her sister. Approximately five minutes passed before Patterson and Barbara walked out of the plant. During this time, Chappell brushed shoulders with Barbara in an aggressive manner. Barbara and Patterson walked out of the plant at approximately 2:23 a.m. and hurried toward Johnson's vehicle, which was parked near Chappell's vehicle in the plant's parking lot. Chappell, carrying her purse, and Legg followed Patterson and Barbara.

{¶ 12} What happens next is a matter of dispute; although much of the outside activity that night was caught on security cameras, the actual shooting was not. Johnson was seated in the driver's seat of her car. Patterson testified that she was trying to get in the back seat of Johnson's car to allow her sister to have the front seat, but she was not able to fit into the back seat, so she went to sit in the front seat.

Barbara, who did not testify at trial, stood outside the car waiting to get in. At this point, according to Patterson, Chappell approached the car, pulled on the driver's side door handle, stated, "[T]his is the b*tch I wanted," and started shooting. Chappell unloaded her gun, hitting both Johnson and Patterson multiple times. Johnson's car sped off, coming to a stop after hitting a tall chain link fence.

{¶ 13} Hason Fischer, a Springco supervisor, testified that he was working that night and witnessed the shooting. Fischer, who testified for the defense, stated that Chappell and Johnson had a "previous beef." Tr. 712. Fischer heard Chappell tell Johnson to get out of the car, "because of the previous beef they had. She [Chappell] said: Get out and fight." Tr. 714.

{¶ 14} Fischer testified that it was hard to see inside Johnson's car because her windows were tinted, but claims he saw three "flashes of light" come from the inside of Johnson's car prior to Chappell shooting her gun, testifying, "I know for a fact three flashes." Tr. 715. He also testified that Chappell never pulled on the door handle; however, Chappell's DNA was later recovered from the driver's side door handle.

{¶ 15} Legg also testified for the defense. Legg testified that she saw Patterson push Chappell shortly before the women all went outside. Chappell pushed Patterson back. Chappell then followed Patterson and her sister outside with the intent to engage them in a fight; Legg testified that it was Patterson who taunted Chappell to fight.

{¶ 16} According to Legg, it was common for Chappell to carry a firearm for protection, and she kept it either in her car or in her purse. Legg claimed that as they were walking up to Johnson's car, Johnson was holding a gun "and then two, maybe three seconds later, that's when the first gunshot went off and glass hit me in the face." Tr. 738. Legg claimed she heard two gunshots emanate from inside the car and only then, after Johnson shot twice, did Chappell unload her gun into Johnson's car.

{¶ 17} Chappell testified that she had owned the gun used in the shooting for about a year but admitted no one at work knew she carried a gun in her purse; Chappell claimed she had no knowledge of the plant's no-firearms policy. Workers at the plant kept their belongings on a table at the back of the plant.

{¶ 18} Chappell testified she had her gun in her purse when she came to work on November 25, 2021. While at work, Patterson got "amped up * * * like she wanted to fight * * * with me"; Chappell claimed that prior to Patterson getting upset, they had not exchanged any words that evening. Tr. 763-764. As Patterson went to push her, Chappell blocked the push and pushed Patterson, who fell. Fischer tried to break up the argument and sent the women to separate areas of the plant.

{¶ 19} Chappell testified she saw Patterson and her sister leaving the building, so she ran after them. She grabbed her purse, which concealed the gun, and brought it outside with her. Chappell testified that she went outside either to fight or to smoke: "I was going to fight. But if I wasn't going to fight, I was going to go to my vehicle and smoke" and "me and Rebecca [Patterson] were going to fight."

Tr. 766. Chappell claimed that it was Johnson who "pulled up on her" in her car and, despite the heavy tint on Johnson's windows, Chappell was able to see that Johnson had a revolver and was pointing it at Legg. Chappell testified that the interior lights were on in Johnson's car, which aided in her ability to see inside the car.

{¶ 20} During cross-examination, Chappell testified that she told Johnson to "put the gun down and fight." Tr. 781. She also testified that she was not chasing Patterson, rather, they were all running the same way. According to Chappell, Johnson fired two shots before Chappell pulled her gun out of her purse and returned fire, unloading her gun into Johnson's car. Chappell testified she shot in self-defense.

{¶ 21} Chappell fired her entire magazine of 13 bullets at Johnson's car. It was the first time she had shot that particular gun, "[s]o after the first shot goes off, the rest are just like automatic. * * * So even when the gun was empty, I [was] still pulling the trigger, because I didn't know what was going on." (Tr. 772). Chappell and Legg then fled in Chappell's car, driving past Johnson's crashed vehicle. According to Chappell, she threw the handgun in a dumpster near her aunt's house.

{¶ 22} Chappell testified that she was hit by broken glass when Johnson shot her gun from inside the car. A DNA swab of suspected blood on the steering wheel of Chappell's car produced a positive DNA match to Chappell that was 761 septillion times more probable than a coincidental match to an unrelated person of the same

race. She further testified that she did not have a "beef" with Johnson; any prior disagreement had been "squashed." Tr. 784-785.

{¶ 23} Diane Maurice, Springco's human resources manager, testified that the company had been having problems with employees drinking, smoking marijuana, and having sex during third shift. She testified that even though Johnson was no longer employed by Springco, the company did not "per se" ban people; Johnson was therefore allowed on the property so long as she remained in the parking lot. Chappell worked at Springco through a temporary employment agency. Maurice testified that all employees, whether they are a direct hire or employed by a temporary employment company, are notified of the company's policies and regulations, which included a prohibition against firearms inside the factory. Maurice testified that there were signs posted in the lobby, on every bulletin board, and at the employee entrance that explained or reiterated the no-firearms policy. All employees were informed of the policy in the employee handbook before they were hired, including temporary agency employees. One of the posted signs warned that anyone bringing firearms into the plant would be considered a trespasser and subject to forfeiture or arrest. Another sign informed employees that "it is illegal to have under the person's control, convey, or attempt to convey a deadly weapon or dangerous ordnance onto these premises. Posted pursuant to the Ohio Revised Code."

{¶ 24} Johnson was struck by two of the 13 bullets Chappell fired into the car. The fatal gunshot entered through her left lateral chest, fractured a rib, went through

the lung, the heart, and then through the other side of her lung, and exited through another rib and the skin of the upper right breast. The second gunshot wound went from the outside to the inside of Johnson's thigh, hit the femur, and stopped. Johnson's skin also had signs of pseudo stippling, caused by the bullet going through some other object, likely glass, before striking her. Patterson also sustained two gunshots wounds. She was taken by ambulance to the hospital and released the same day.

{¶ 25} Curtiss Jones, supervisor of the Cuyahoga County Medical Examiner's Trace Evidence Unit, testified that he examined Johnson's clothing and car. Jones testified that there were at least 13 bullet holes in Johnson's car, most of them on the side of her car. Of those 13, five defects were from the driver's side car window. According to Jones, two of the bullet holes, labeled I and J, showed a directionality from the inside of the vehicle to the outside of the vehicle and one of the bullet holes, marked J, was the first bullet to hit the window. Jones was not able to tell to a degree of scientific certainty which of the 13 defects was made first; thus, he was unable to tell if the first bullet came from inside the car or outside the car. Jones was also not able to confirm the muzzle-to-target distance on any of the defects.

{¶ 26} Jones testified that he collected gunshot residue from Johnson's hands, and this meant that she either fired a weapon, was in close proximity to the shooting of a gun, or that there was a transfer of residue from some other surface. He could not conclusively say that Johnson had shot a gun from inside her car.

{¶ 27} Detective Cramer ("Det. Cramer") testified that he interviewed Legg on December 7. He had a paper copy of a screenshot of the text messages between Patterson and Johnson, which he showed Legg. Det. Cramer inadvertently left them at Legg's house; he was later able to retrieve the papers. Shortly thereafter, on December 13, screenshots of the text messages along with a video of Chappell were posted on Instagram's Cleveland Remembrance page, which is an Instagram page that memorializes people in the area who have died.

{¶ 28} On December 14, Chappell left a voicemail for Det. Cramer, who returned her call, but the call went straight to voicemail. Det. Cramer left a message, but Chappell never responded or otherwise contacted the police. Chappell was arrested in early January 2022, approximately six weeks after the shooting.

## Assignments of Error

> I. The trial court erred in entering a conviction for aggravated murder as such conviction was based upon insufficient evidence of prior calculation and design, in violation of defendant's right to due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution.

> II. The trial court erred in entering convictions for aggravated murder, murder, and felonious assault, in violation of defendant's right to due process of law as guaranteed by the Fifth and Fourteenth Amendments to the United States Constitution, as being against the manifest weight of the evidence as to defendant's right to self-defense.

## Law and Analysis

### Sufficiency of the Evidence

{¶ 29} In her first assignment of error, Chappell contends that her conviction for aggravated murder was supported by insufficient evidence.

{¶ 30} "In a sufficiency-of-the-evidence inquiry, the question is whether the evidence presented, when viewed in a light most favorable to the prosecution, would allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt." *State v. Groce*, 163 Ohio St.3d 387, 2020-Ohio-6671, 170 N.E.3d 813, ¶ 7, citing *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. When considering the legal sufficiency of the evidence, appellate courts do not engage in a determination of witness credibility. *State v. Goff*, 82 Ohio St.3d 123, 139, 694 N.E.2d 916 (1998). Rather, the relevant inquiry is whether the evidence presented, if believed, is sufficient to support the conviction. *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, ¶ 16, citing *State v. Thompkins*, 78 Ohio St.3d 380, 390, 678 N.E.2d 541 (1997) (Cook, J., concurring). "The issue of whether a conviction is supported by sufficient evidence is a question of law, which we review de novo." *State v. Campbell*, 2d Dist. Montgomery No. 26575, 2016-Ohio-598, ¶ 6, citing *Thompkins* at 386.

{¶ 31} In challenging her conviction for aggravated murder, Chappell contends her conviction was not supported by sufficient evidence because the state failed to prove that she acted with prior calculation and design.

{¶ 32} Chappell was convicted in Count 1 of aggravated murder, in violation of R.C. 2903.01(A), with one- and three-year firearm specifications. The state's theory was that Chappell acted with prior calculation and design when she shot and killed Johnson. "'In reviewing whether evidence is sufficient to establish the prior-calculation-and-design element of aggravated murder, a court must consider

whether the evidence, when viewed in the light most favorable to the prosecution, supports a finding that [the] defendant acted with advance reasoning and purpose to kill.'" *State v. Nicholson*, Slip Opinion No. 2024-Ohio-604, ¶ 51, quoting *State v. Jones*, 166 Ohio St.3d 85, 2021-Ohio-3311, 182 N.E.3d 1161, ¶ 2 (lead opinion), citing *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, ¶ 18. "'Evidence of an act committed on the spur of the moment or after momentary consideration is not evidence of a premeditated decision or a studied consideration of the method and the means to cause a death.'" *Nicholson* at *id.*, quoting *Walker* at *id.*; s*ee also State v. Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, 216 N.E.3d 653, ¶ 26.

{¶ 33} "'There is no bright-line test for determining whether a defendant's actions show a premeditated decision or studied consideration to kill — each case turns on its own facts.'" *Nicholson* at ¶ 52, quoting *Jones* at ¶ 17. The Ohio Supreme Court has identified three factors as pertinent, but not dispositive, considerations for determining whether there was sufficient evidence of prior calculation and design. *Nicholson* at *id.*, citing *Jones* at *id.* The three factors are: "'" (1) Did the accused and victim know each other, and if so, was that relationship strained? (2) Did the accused give thought or preparation to choosing the murder weapon or murder site? (3) Was the act drawn out or 'an almost instantaneous eruption of events?''" *Nicholson* at *id.*, quoting *State v. Taylor*, 78 Ohio St.3d 15, 19, 676 N.E.2d 82 (1997), quoting *State v. Jenkins*, 48 Ohio App.2d 99, 102, 355 N.E.2d 825 (8th Dist.1976).

{¶ 34} Patterson testified that both she and Johnson had a strained relationship with Chappell. As to Johnson, Patterson testified that Chappell and Johnson did not get along and that their strained relationship started over a male friend; allegedly the man was dating one of Johnson's friends and was also simultaneously dating Chappell. Patterson testified that Chappell and Johnson had had issues for months and both had, at one point, gotten fired from Springco due to the situation.

{¶ 35} Legg also testified as to the strained relationship between Chappell and Johnson:

> Prosecutor: And you know that your cousin and Dominique Johnson had a strained relationship, right?
>
> Legg: Correct, yeah.
>
> Prosecutor: They didn't get along with one another, did they?
>
> Legg: I wouldn't say they didn't get along. They just didn't tolerate each other.
>
> Prosecutor: They didn't tolerate each other?
>
> Legg: Correct.

Tr. 746.

{¶ 36} Fischer, the previously mentioned shift supervisor, testified that Chappell and Johnson had a "previous beef." He heard Chappell tell Johnson to get out of the car and fight, "because of the previous beef they had. She [Chappell] said: Get out and fight."

{¶ 37} The evidence shows that Chappell gave thought to the details of the murder. After arguing with Patterson, she went and got her purse that concealed a loaded gun. Chappell chose to take her purse with the gun and pursue Patterson and Barbara outside to where Johnson was waiting. Chappell then tried to open Johnson's car door, saying, "[T]his is the b*tch I want," before shooting 13 times. The jury could reasonably infer that with every step Chappell took towards Johnson's car, as she pulled her gun from her purse, and finally when she tried to open the car door, she calculated her plan to kill Johnson.

{¶ 38} Finally, we consider whether the shooting was an instantaneous eruption of events. Less than a minute passed between the time Chappell stepped out of the building to her shooting at Johnson's car 13 times. Chappell argues that the time frame demonstrates that the shooting was an instantaneous eruption of events. Again, we emphasize there is no established minimum time period within which a person can form the intent to kill.

{¶ 39} The record reflects that at 2:23:53 a.m. one of the security cameras captured Barbara and Patterson leaving Springco, hurrying towards the direction of Johnson's car. Patterson testified that she and her sister were hurrying because they wanted to get out of there due to "everything that was going on." Patterson further testified that Chappell "was not far behind us, leaving out." At 2:24:03 a.m., the camera captures Chappell and Legg walking at a rapid pace following Patterson and her sister. At 2:24:14 a.m., Chappell can be seen reaching into her purse, where her gun was located. According to Patterson, at 2:24:24 a.m. she was trying to get into

Johnson's car and "it was around this point in time" that Chappell grabbed the driver's side door handle. At 2:24:40, Johnson's car reenters the frame of the security camera, speeds across the parking lot, and crashes into a fence.

{¶ 40} Chappell relies on *State v. Walker*, 150 Ohio St.3d 409, 2016-Ohio-8295, 82 N.E.3d 1124, where the Ohio Supreme Court affirmed a decision from this court that found insufficient evidence of prior calculation and design when 20 seconds elapsed between the time the defendant move out of security camera range before shooting the victim. In *Walker*, the defendant murdered the victim in a bar following an argument. The defendant did not know the victim and the killing resulted from a spontaneous eruption of events. *Id*. at ¶ 27.

{¶ 41} *Walker* is distinguishable. The court did not find that the brief 20-second time span between walking off camera and shooting was dispositive. Rather, the court focused on facts that the defendant and the victim did not know each other, that the killing resulted from a spontaneous eruption of events, and the defendant had not given thought as to the murder site. *Id*. at ¶ 23.

{¶ 42} Here, not only did the defendant and the decedent know each other, but there was evidence of a strained relationship. Approximately five minutes elapsed between the time Barbara walked into the plant to get her sister and the time she and Patterson hurried out of the plant, followed by Chappell. Chappell's consideration occurred when she went to get her purse and followed Patterson outside to fight.

{¶ 43} In *Nicholson*, Slip Opinion No. 2024-Ohio-604, the Ohio Supreme Court affirmed the aggravated murder convictions of the defendant, who killed his girlfriend's two teenaged children. The facts established that the defendant attacked his girlfriend in their kitchen. During the brief attack, he threatened to kill her children. When the children came into the room, appellant pushed one of the children and pinned the child to the floor. The girlfriend interceded and the child was able to get up and call 911. Upset that the child called police, the appellant went to the bedroom and retrieved a gun. He then shot the two children as they were running away from the house, firing 13 shots. The defendant estimated that from the time he left the kitchen to grab the gun to the time he shot the children was 40 seconds. The court held that the defendant's decision to leave the kitchen to go to the bedroom to retrieve a loaded gun and then fire 13 shots at the victims' backs showed more than a "momentary impulse." *Id.* at ¶ 51, citing *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 46. The court reasoned that even if the appellant's actions took less than a minute, they evinced his "determin[ation] to complete a specific course of action" and allowed the jury to infer "that he had adopted a plan to kill." *Nicholson* at *id.*, citing *Conway*.

{¶ 44} Here, the evidence presented at trial was that Chappell and Johnson had a previous disagreement and both had been let go from Springco due to the disagreement. On the night of the shooting, Chappell had a gun in her purse and admitted to wanting to fight. Before leaving the building to pursue Patterson, Chappell went and got her purse containing the gun. Chappell then pursued

Patterson and her sister, took her gun out of her bag, grabbed the driver's side door handle of Johnson's car, ordered Johnson to get out of the car and fight, and fired 13 shots at the car, killing Johnson.

{¶ 45} As mentioned, whether an offender acted with prior calculation and design turns on the facts of the case; while *Walker* and *Nicholson* may be illustrative, we consider the particularities of this case. Viewing the evidence in a light most favorable to the state, we find sufficient evidence of the elements of aggravated murder.

{¶ 46} The first assignment of error is overruled.

**Self-Defense**

{¶ 47} In the second assignment of error, Chappell argues that the jury's rejection of her claim that she acted in self-defense was against the manifest weight of the evidence.

{¶ 48} When evaluating a claim that a jury verdict is against the manifest weight of the evidence, "we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that we must reverse the conviction and order a new trial." *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 168, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). Reversing a conviction based upon the weight of the evidence should occur "'only in the exceptional case in which the evidence weighs heavily against the conviction.'"

*Thompkins* at *id.*, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717

(1st Dist.1983).

{¶ 49} A self-defense claim includes the following elements:

(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.

*Messenger*, 171 Ohio St.3d 227, 2022-Ohio-4562, 216 N.E.3d 653, at ¶ 14, quoting

*State v. Barnes*, 94 Ohio St.3d 21, 24, 759 N.E.2d 1240 (2002).

{¶ 50} The state need only disprove one of the foregoing elements beyond a

reasonable doubt to carry its burden of persuasion. *State v. Williams*, 9th Dist.

Summit No. 29444, 2020-Ohio-3269, ¶ 10.

{¶ 51} In 2019, 2018 Am.Sub.H.B. No. 228 ("H.B. 228") took effect,

amending Ohio's self-defense statute. Before the amendments, a defendant

claiming self-defense had the burden of proving the elements of self-defense by a

preponderance of the evidence. *Nicholson*, Slip Opinion No. 2024-Ohio-604, at

¶ 67, citing *Messenger*, citing former R.C. 2901.05(A). A defendant claiming self-

defense now no longer has the burden of proving its elements by a preponderance

of the evidence; under H.B. 228, the burden of proof is as follows:

If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, * * * the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense * * *.

*Nicholson* at *id.*, citing R.C. 2901.05(B)(1).

{¶ 52} Thus, under the applicable version of the statute, the state's burden to prove that Chappell did not act in self-defense was triggered when Chappell produced legally sufficient evidence of self-defense. *Nicholson* at *id.*

{¶ 53} At the close of trial, the trial court provided the jury with an instruction regarding self-defense, which means that the trial court concluded that Chappell put forward sufficient evidence that she was acting in self-defense when she shot and killed Johnson. The jury's guilty verdict means that the state met its burden of persuading the jury beyond a reasonable doubt that Chappell was not acting in self-defense when she killed Johnson. As the Ohio Supreme Court explained, the sufficiency-of-the-evidence standard of review applies to the defendant's burden of production and a manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion. *Messenger* at ¶ 26.

{¶ 54} Chappell's challenge relative to self-defense, and the convictions in general, is whether the state met its burden of persuasion; that is, under a manifest-weight-of-the evidence review, whether the state met its burden of persuading the jury beyond a reasonable doubt that she was not acting in defense of herself or Legg when she fired her gun. *Id.*

{¶ 55} In *State v. Palmer*, Slip Opinion No. 2024-Ohio-539, ¶ 25, the Ohio Supreme Court reaffirmed that a defendant "did not need to present adequate evidence that every reasonable person would have believed he [or she] was in imminent danger and that deadly force was necessary," but rather, the defendant

"only needed to present adequate evidence that a reasonable person, under the same circumstances and with [defendant's] same subjective beliefs and faculties, would have believed that he [or she] was in imminent danger and that deadly force was necessary." *Id.*, citing *State v. Thomas*, 77 Ohio St.3d 323, 330, 673 N.E.2d 1339 (1997).

{¶ 56} Under Ohio's "stand your ground" law, R.C. 2901.09(B), "a person has no duty to retreat before using force in self-defense, defense of another, or defense of that person's residence if that person is in a place in which the person lawfully has a right to be." The trial court here instructed the jury as follows:

> In determining whether the defendant in using force in self-defense reasonably believed that the force was necessary to prevent injury, loss, or risk to life or safety. A person has no duty to retreat before using force in self-defense if the person was in a place in which she lawfully had a right to be at the time the person used force. The defendant no longer had a duty to retreat if she withdrew from the situation and no longer participated in it, and she then had reasonable grounds to believe and an honest belief that she was in imminent danger of great bodily harm, and the only means of escape from that was by the use of deadly force, even though she was mistaken as to the existence of that danger.
>
> A person who lawfully is an occupant of her vehicle has no duty to retreat before using force in self-defense.
>
> However, a person has a duty to retreat if she was at fault for creating the situation, giving rise to the affray, if she did not have reasonable grounds to believe and an honest belief that she was in imminent danger of death or great bodily harm, or that she had a reasonable means of escape from that danger, other than by use of deadly force.

(Tr. 886-887.)

{¶ 57} "'A self-defense claim is generally an issue of credibility.'" *State v. Lawrence*, 11th Dist. Lake No. 2022-L-110, 2023-Ohio-3419, ¶ 41, quoting *State v. Olsen*, 11th Dist. Ashtabula No. 2022-A-0071, 2023-Ohio-2254, ¶ 57. "'Disputes in credibility for the purposes of evaluating self-defense are best resolved by the trier of fact.'" *Lawrence* at *id.*, quoting *State v. Bentley*, 2023-Ohio-1792, 218 N.E.3d 989, ¶ 24 (11th Dist.). "'It has been held that "a conviction is not against the manifest weight of the evidence because the trier of fact believed the state's version of events over the defendant's version" and rejected the defendant's claim of self-defense.'" *Lawrence* at *id.*, quoting *Bentley* at *id.*, quoting *State v. Messenger*, 2021-Ohio-2044, 174 N.E.3d 425, ¶ 49 (10th Dist.). "When weighing witness testimony supporting a claim of self-defense, the trier of fact is 'free to believe or disbelieve the testimony of the witnesses' and 'is in the best position to take into account inconsistencies, along with the witnesses' manner and demeanor, and determine whether the witnesses' testimony is credible.'" *Lawrence* at *id.*, quoting *Bentley* at *id.*, citing *State v. Haney*, 11th Dist. Lake No. 2012-L-098, 2013-Ohio-2823, ¶ 43.

{¶ 58} Chappell asserts that the evidence at trial supported a claim of self-defense, arguing that she only pulled out her gun and shot Johnson because Johnson shot first, and she (Chappell) needed to protect herself and her cousin.

{¶ 59} We find Chappell's argument unpersuasive. The evidence shows that Patterson and her sister were retreating; they were leaving the building to catch a ride with Johnson. Chappell pursued them, looking to fight. Chappell caused the affray between herself and Johnson when she walked outside with her gun in her

purse, pulled on Johnson's door handle, exclaimed, "[T]his is the b*tch I wanted," and ordered Johnson to get out of the car and fight.

{¶ 60} We are similarly unpersuaded by Chappell's argument that she was in imminent danger of death or serious bodily harm and that her only option for escape was to use deadly force. Johnson, Patterson, and Patterson's sister were actively trying to leave the plant and go home. Chappell chose to pursue them and prevent their egress, which would have resulted in the dissipation of any danger that Chappell may have faced. Chappell was not being pursued or threatened and walked up to Johnson's closed car window to engage her. Even though scientific evidence showed that two shots were fired from inside the car, the jury as the finder of fact did not believe that Chappell fired in response to those two shots, but that she murdered Johnson.

{¶ 61} Finally, the state claimed that Chappell violated her duty to retreat when she shot and killed Johnson because she was not lawfully on the premises due to the concealed firearm. "[A] person has no duty to retreat before using force in self-defense * * * if that person is in a place in which the person lawfully has a right to be." *Palmer*, Slip Opinion No. 2024-Ohio-539, at ¶ 23. Signs posted in the Springco facility warned employees that they are considered trespassers and are subject to arrest if they brought firearms onto the property or premises. This no-firearms policy was conveyed to employees via the employee handbook and all employees, including those from temporary agencies, were made aware of the policy upon hire. The plant had multiple signs posted around the facility warning

employees of the policy. The jury could consider this evidence when determining whether Chappell was acting in self-defense.

{¶ 62} Considering the above, we hold that the state satisfied its burden of proving that Chappell was not acting in self-defense when she killed Johnson and the jury's decision to reject Chappell's claim of self-defense was not against the manifest weight of the evidence.

{¶ 63} The second assignment of error is overruled.

{¶ 64} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, JUDGE

EILEEN A. GALLAGHER, P.J., CONCURS;
MARY J. BOYLE, J., CONCURS IN JUDGMENT ONLY