[Cite as *State v. Kennedy*, 2025-Ohio-1330.]

COURT OF APPEALS
STARK COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  |  |
|---|---|---|
| | : | JUDGES: |
| | : | Hon. William B. Hoffman, P.J. |
| STATE OF OHIO | : | Hon. Michael D. Hess, J. |
| | : | Hon. Jason P. Smith, J. |
| Plaintiff-Appellee | : | |
| | : | |
| -vs- | : | Judges Hess and Smith |
| | : | Sitting by Assignment by the |
| | : | Supreme Court of Ohio |
| | : | |
| WILLIS RICARDO KENNEDY | : | Case No.  2024 CA 00035 |
| | : | |
| Defendant-Appellant | : | O P I N I O N |


CHARACTER OF PROCEEDINGS:          Appeal from the Stark County Court of
                                   Common Pleas,
                                   Case No. 2023 CR 1475


JUDGMENT:                          Affirmed


DATE OF JUDGMENT ENTRY:            April 14, 2025


APPEARANCES:

For Plaintiff-Appellee                    For Defendant-Appellant

KYLE L. STONE                             GEORGE URBAN
Prosecuting Attorney, Stark County, Ohio  116 Cleveland Ave N.W., Ste. 808
CHRISTOPHER A. PIEKARSKI                   Canton, Ohio 44702
Assistant Prosecuting Attorney,
Appellate Division,
110 Central Plaza South, Ste. 510
Canton, Ohio 44702

*Hess, J.*

{¶1}   Defendant-Appellant Willis Ricardo Kennedy appeals the judgment entered by the Stark County Common Pleas Court convicting him following a jury trial of murder (R.C. 2903.02(B)(D)(B)) and felonious assault (R.C. 2903.11(A)(2)(D)(1)(a)), and sentencing him to an aggregate term of 15 years to life in prison. Plaintiff-appellee is the State of Ohio.

## I.   STATEMENT OF THE FACTS AND CASE

{¶2}   In August 2023, the grand jury of Stark County indicted Kennedy on one count of murder and one count of felonious assault arising out of a deadly stabbing that occurred in June 2023 at the Girard Gardens Apartments. Kennedy pleaded not guilty, and the matter proceeded to trial.

{¶3}   The State presented testimony from Canton Police Officer Scott Wohlheter. Officer Wohlheter arrived at the Girard Garden Apartments in response to a stabbing and possible shooting incident. Officer Wohlheter and his partner located the victim, who was sitting on a broken-out windowsill, completely covered in blood. The victim had multiple stab wounds to his head, neck, and face, and was unable to speak. Officer Wohlheter called for a medic team and administered first aid until they arrived. Officer Wohlheter retrieved the security video for the apartment building, which the State introduced into evidence. Officer Wohlheter testified that the video showed Kennedy standing in the elevator area of the lobby. The victim pulled up into the parking lot and walked into the vestibule area of the lobby. Kennedy and the victim exchanged words and the victim left the building, turning his back to Kennedy.  The victim pulled out a firearm, appeared to say something to Kennedy, and then put it back in his pants and continued to walk away

from Kennedy. Kennedy exited the building and followed the victim and began stabbing the victim multiple times. The victim attempted to retrieve his firearm again to defend himself, the two ended up falling into and breaking a window, with Kennedy continuing to stab the victim. Kennedy left the victim and got into a car and fled at a high rate of speed through the parking lot. Another male approached the victim, took the victim's firearm, and put it in an apartment, but dropped his phone at the crime scene and is apprehended and questioned when he returns to retrieve his phone.

{¶4}    Canton Police Officer Calab Bodjanac testified that he also responded to the stabbing incident. As he approached the apartment building, Officer Bodjanac stopped and apprehended Kennedy, who was walking away from a vehicle that had crashed just past the apartments. When Officer Bodjanac stopped, Kennedy was lying down in the street on his stomach. He handcuffed Kennedy, who was covered in blood, and asked him if he needed medical attention. Kennedy stated that he did not. The State introduced video evidence that showed Kennedy exiting the crashed vehicle and Officer Bodjanac arriving at the scene. Officer Bodjanac testified that although Kennedy declined medical attention initially, he wanted it after hearing a radio call that he would be taken in for questioning, "After that came out over the radio, Mr. Kennedy had made a comment stating that he did need medical attention because he got small shards of glass in his eye while he was stabbing the fuck out of some bitch." The State introduced Officer Bodjanac's body camera footage of Kennedy's comment. After Officer Bodjanac transported Kennedy to the hospital, he turned off his body camera as part of the protocol governing patient privacy. While at the hospital Kennedy made several additional comments to Officer Bodjanac, " . . . he asks me if my body camera was working, and I

told him that it does, even though it wasn't currently on at the time. And he looked down at my body camera and stated, Who brings a knife to a gun fight? And then he laughed and laid back down. And then he had made an additional comment stating that he knows his brother was DOA, and asked if he went to the hospital before he got transported to the morgue."

{¶5}　Canton Police Detective Daniel Szaniszlo testified that the victim was a 54-year-old male with military service and an Armed Service Army license plate who was at the Girard Gardens Apartments to visit someone. Detective Szaniszlo interviewed Kennedy, which was video and audio recorded and played for the jury. During the interview, Kennedy states that he ingested PCP, a narcotic hallucinogen, within 24 hours of the stabbing and was leaving the scene with a mechanic friend. Kennedy states that after the victim left the lobby, Kennedy shut the lobby door and it locked. Then Kennedy states that he exited the lobby and attacked the victim from the back and that he tapped the victim on the back and began stabbing him across the face and he "went to town on him." Kennedy stated that the victim threatened him if he were to come back outside, but Kennedy did not state that there was an immediate threat of harm.  Kennedy let a second or two pass after the victim exited the lobby before going after him.  Kennedy states that he came up behind the victim and tapped on him to get his attention. Kennedy told Detective Szaniszlo that he did not give the victim time to turn all the way around and he "went to work on his left side." In response to being asked if he had made a mistake, Kennedy nodded his head in agreement that he had. Detective Szaniszlo testified that Kennedy brandished a weapon first when he pointed the knife at the victim while the two stood in the lobby. Detective Szaniszlo testified that the security video shows that

Kennedy confronts the victim and has the knife in his hand the entire time he is interacting with the victim in the lobby and that the victim then leaves the building. The door is shutting and then Kennedy goes back through the door in an attacking posture. When the victim is farther away from the door, Kennedy goes out and attacks the victim and the victim pulls his gun out. Kennedy continues to stab the victim, who manages to get one shot fired. Detective Szaniszlo testified that Kennedy told him that there were people on the fourth floor of Girard Gardens that were threatening him, but the detective was unable to locate any persons or witnesses to confirm this. Detective Szaniszlo testified that the stabbing had no connection with any persons associated with the fourth floor.

{¶6} Canton Police Detective Vinny Romanin testified that he reviewed the security video that shows the victim park his truck in a handicap space – he has a handicap placard and walks with a limp – and enter the lobby of the apartment building. As the victim approaches the door, Kennedy is waiting inside the lobby, behind secured locked doors with a knife. Kennedy unlocks the second set of lobby doors so that the victim can enter. Kennedy confronts the victim with the knife and they exchange words. The victim leaves the building and Kennedy initially goes back into the building, but quickly turns around and goes back outside. Based on the video, Detective Romanin observed that the victim was attempting to remove himself from interaction with Kennedy. The victim is backing out, going outside, and walking towards a group of people seated around a patio area. The victim initially produces a firearm after he is outside but then puts it back away. Kennedy emerges from the building, comes up behind the victim, and begins attacking him with the knife. Kennedy continues to attack the victim even after both have fallen through and shattered a glass window. At no point during the attack does the victim

point a gun at Kennedy. Detective Romanin interviewed Kennedy with Detective Szaniszlo at the police station. Detective Romanin testified that Kennedy told them that he thought the victim was associated with people on the fourth floor of the building that intended to do him harm. Kennedy also told them that after the victim left the lobby he told Kennedy, "boy, you come outside with that, I got this for you" meaning that if Kennedy came outside with the knife, the victim had a gun. Kennedy told them that in response to the victim's statement, he went outside and fatally stabbed the victim. Detective Romanin testified that the video shows Kennedy tapping the victim on the shoulder and slicing his face before the victim appeared to even know that Kennedy was there.

{¶7}    Dan Galita, a forensic pathologist who performed the autopsy on the victim, testified that the cause of death was 22 stab wounds. Galita testified that several of the wounds alone would have been fatal, including a stab wound to the left orbit, or eyeball, which is particularly damaging because it causes very intense pain that can cause loss of consciousness and a heart attack. Perforation of the larynx caused loss of speech and perforation of the left lung caused excessive blood to accumulate and prevented breathing.

{¶8}    The defense called Darla Risby, a resident of Girard Gardens Apartments who was on the patio when the stabbing occurred. She testified that the evening before the incident Kennedy "had got stoned, buck naked, rolling around on the ground like a fish" and her two granddaughters were there in her apartment and witnessed it out the window. The evening of the stabbing Kennedy was again acting weird and agitated. Ms. Risby testified that Kennedy was acting agitated before the victim arrived, walking back and forth, in and out of the building, and talking to himself. Ms. Risby testified that she

saw the victim go towards the door and then back out of the door and turn to walk toward her and others on the patio.

> A:  He backed out the building, he came toward us on the patio. And at that time, he was pulling a gun out of his pocket and he said, I don't know what this MF wants, but I got something for him. But right at that time, Mr. Kennedy came up behind him and just started stabbing this man, this innocent man, because he had nothing to do with what was going on. Nothing at all. And he's just stabbing him, stabbing him. And I called the police. And I think a number of other people called the police, and it was just  - - it was something that I haven't been able to forget.

*     *     *

> A: Anyway, he backed out the door. And as he was coming out the door, like I said, he turned toward the patio. And at that time he was pulling out - - pulling his gun out of his pocket and saying, I don't know what the - - this MF wants but I have something for him. But before he can get his gun all the way out, Mr. Kennedy just came out with the big knife and just stabbed him. And it's like he just kept stabbing him.

> Q: Do you recall if [the victim] ever fired that gun?

> A: No he did not. I didn't hear it anyway.  But I was in the process of - - I went around the east - - back of the building on the side and then I called the police. And then I come back around, and I still seen him stabbing him so I went back around. It just - - I have nightmares. That just - - it was unnecessary.

*     *     *

> Q: Remember hearing a pop?

> A: No. I don't, I don't even think he had his gun in position to fire anything before Mr. Kennedy came up behind him, he snuck him.

**{¶9}**    The State declined to cross-examine Ms. Risby.

**{¶10}**  Kennedy testified that he had an unrelated verbal altercation with a resident who did not like the fact that Kennedy had been flopping around naked on the lawn the evening before. The two had words on the elevator, which eventually led to Kennedy going to the fourth floor and arguing with several people there. Kennedy left the fourth floor and went to his apartment to retrieve his knife. Kennedy went outside where he

expected to fight with people from the fourth floor. While outside, he waited and was "dancing around" and talking to the people on the patio, including Darla Risby, to whom he apologized for his naked antics the night before.

**{¶11}** Kennedy testified that he went back inside and was waiting by the elevator when the victim arrived. Kennedy did not know the victim and had never seen him before. Kennedy brandished the knife at the victim and exchanged words, but did not otherwise make an aggressive gesture with the knife. Kennedy was skeptical of the victim because the people on the fourth floor had told Kennedy earlier that they were going to call someone to come over and kill him. Kennedy believed that the people from the fourth floor would have described his appearance to any hitman that they had hired. Kennedy testified that he believed the victim was the hired hitman because he asked the victim "Did they send you?" and the victim replied, "Oh, that's you with the mask." As the victim was backing up and leaving, he told Kennedy, "I'll pop you." At that point, Kennedy did not see a gun on the victim and the victim did not show him a gun. As the victim and Kennedy both walked away from each other, Kennedy kept an eye on him and heard him say "I got this for him." Kennedy testified that as a result of hearing that statement, Kennedy came back and saw the gun. After he saw the gun, "I didn't wait. It was immediate. I'm disadvantaged. I've got the lesser weapon. I didn't want to wait until after I had been shot to try to fight. That, you know, is not conducive to survival. I mean, it was either attack or nothing." Kennedy testified that the victim fired two or three shots at him during the attack. After the attack was over, Kennedy stood around dazed until a mechanic friend said, "Man, get the hell outta here." Kennedy drove the car to a fire station where he dropped off the mechanic and then drove back to the apartments where he saw

police and pulled over, parked, and surrendered. Kennedy testified that he came back because he had nothing to hide. He asked the officers, "Would you have done the same thing?" because when a guy pulls a gun on an officer, an officer does the same thing.

{¶12} On cross-examination, Kennedy admitted that during his police interview, he never told the police that the victim confirmed his suspicions that the victim was hired to kill him. Instead, Kennedy only told the police he had suspicions, "I think he was out there to get me." Kennedy also testified that he heard the victim state, "If you come outside, I've got this for you," which alternatively means, Kennedy conceded, if he doesn't come outside, he doesn't have a gun for him. Kennedy agreed it was a conditional threat with the victim outside the lobby's closed doors and Kennedy inside the lobby doors. At that point Kennedy admitted he just acted on emotion, adrenaline, and instincts. Kennedy testified that he stabbed the victim in the neck before he had a chance to turn around, then as the victim spun around to face Kennedy, Kennedy got him on the sides and "just went to work on him." Kennedy testified, "I'm not denying that I attacked him first, I definitely attacked him first." Kennedy explained that the victim made a verbal threat against Kennedy's life as the victim walked away and was on the other side of the locked doors from Kennedy. Kennedy claimed that he feared imminent harm because "it was going to happen sooner or later. I mean, if he didn't get in the building right then, he was going to come in later . . . ." Kennedy claimed that his phone was in his car so he could not immediately call the police for assistance.

{¶13} The jury convicted Kennedy on both counts and the trial court merged the felonious assault conviction into the murder conviction and sentenced him to a term of

incarceration of fifteen years to life for murder. It is from the February 12, 2024 judgment of the trial court that Kennedy prosecutes his appeal, assigning as error:

I. THE TRIAL COURT ABUSED ITS DISCRETION WHEN PARTIALLY DENYING APPELLANT'S MOTION IN LIMINE SEEKING TO PRECLUDE THE PROSECUTION FROM CHARACTERIZING [K.G.] AS A VICTIM.

II. THE VERDICT WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE THEREBY VIOLATING APPELLANT'S GUARANTEE OF DUE PROCESS PURSUANT TO THE FOURTEENTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND ARTICLE ONE, SECTION TEN OF THE OHIO CONSTITUTION.

III. THE STATE PRODUCED INSUFFICIENT EVIDENCE TO REFUTE THE APPELLANT'S SELF-DEFENSE CONTENTION BEYOND A REASONABLE DOUBT.

IV. THE TRIAL COURT ERRED BY FAILING TO GIVE THE JURY CURATIVE INSTRUCTIONS WITH REGARD TO APPELLANT'S SUSTAINED OBJECTIONS THROUGHOUT TRIAL, THEREBY VIOLATING APPELLANT'S SUBSTANTIAL RIGHTS.

## II. LEGAL ANALYSIS

### A. Motion in Limine

**{¶14}** In his first assignment of error, Kennedy argues that the trial court abused its discretion when it allowed the prosecution to characterize K.G. as the "victim." Kennedy filed a motion in limine in which he asked that the jury instructions, trial court judge, witnesses, and the prosecution not be permitted to refer to K.G. as a "victim." Kennedy cited two cases in which the defendant complained about the use of the term "victim." *State v. Almedom*, 2016-Ohio-1553 (10th Dist.) and *State v. Wright,* 2003-Ohio-3511, ¶ 6 (9th Dist.).

**{¶15}** The trial court granted the motion in limine in part and agreed that the trial court judge would refrain from using the term "victim," but it determined that it would wait to rule on other's use of the term as it arose during trial:

> [T]he Court will refrain from referring to him as the victim. As you indicated, the jury instructions do not use that term, but the State is free to make its argument. But if it does become an issue or if there's a characterization that appears to be unfair or unduly prejudicial to the Defendant, I will step in and address that at that time.

**{¶16}** Kennedy argues that the trial court abused its discretion in partially denying the motion in limine. However, Kennedy never objected to the use of the term "victim" during the trial and his appellate brief does not contain a single reference to the record in which the term "victim" was used. *State v. Ashcroft*, 2021-Ohio-3897, ¶ 12 (5th Dist.) ("under App.R. 12(A)(2), an appellate court may 'disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based' ").

**{¶17}** Moreover, as the State correctly argues, a motion in limine does not preserve an issue for appeal; a proper objection must be lodged.

> The granting or denial of a motion in limine is a tentative, interlocutory, precautionary ruling reflecting the trial court's anticipatory treatment of an evidentiary issue. A motion in limine does not preserve an issue for appeal. Rather, in order to preserve the error, the evidence must be presented at trial, and a proper objection lodged. Once properly preserved an appellate court will then review the trial court's ruling on the objection rather than the ruling on the motion in limine.

(Citations omitted.) *State v. Lovingshimer,* 2021-Ohio-3339, ¶ 31 (5th Dist.).

**{¶18}** Finally, even if we were to consider Kennedy's argument, his cases are distinguishable because the focus is on *the trial court judge's* use of the term "victim," not the prosecutor and witnesses. In *State v. Almedom*, 2016-Ohio-1553 (10th Dist.), the trial

court judge repeatedly referred to young children who allegedly had been sexually abused as "victims." The appellate court found that the ineffectiveness of trial counsel coupled with the trial court judge's repeated use of the term "victim," deprived the defendant of a fair trial. "The trial court judge, who is viewed as the ultimate authority figure in the courtroom, in essence told the jury more than once that Almedom had victimized three young girls." *Id.* at ¶ 11.

{¶19} In *State v. Wright,* 2003-Ohio-3511, ¶ 6 (9th Dist.), the trial court judge, prosecutor, and defense counsel all used the term "victim." The appellate court found that the references to "victim" were harmless errors and sustained the conviction. In dicta, the appellate court stated that the trial court judge should refrain from using the term victim. *Id.* In both *Almedom* and *Wright,* the appellate court's admonition was against the *trial court judge* using the term "victim," not the prosecution or its witnesses.

{¶20} Importantly, in subsequent cases both our Court and the Tenth District Court of Appeals distinguished *Almedom* on the basis that it was the trial court judge – not the prosecution – that repeatedly use the term "victim." In *State v. Lovingshimer*, 2021-Ohio-3339 (5th Dist.), we found:

> In *Almedom*, however, most of the offending references were made by the trial court judge, not the prosecutor. Additionally, the improper references were made throughout the entire trial. The *Almedom* court also found that defense counsel's ineffective assistance, linked with the trial court's and prosecutor's prejudicial comments, "undermined the proper function of the adversarial process" so that it could not "be sure a just result was produced." The instant matter presents no comparable facts.

(Citation omitted.) *Id.* at ¶ 34. In *State v. Nichols*, 2020-Ohio-4362 (10th Dist.), the appellate court found:

> We find *Almedom* readily distinguishable from the instant matter. First and foremost, in *Almedom*, the offending references to the witnesses as

"victims" were made by the trial judge, not the prosecutor. While a trial judge must remain detached and neutral in any matter before the court, the prosecutor is not constrained by any such obligation of neutrality.

(Citation omitted) *Id.* at ¶ 39.

**{¶21}** Kennedy did not preserve this issue by raising an objection during trial, he cites no instances in the record where the term "victim" was used by the trial court judge, and, even if we were to consider his argument, the prosecutor and its witnesses are not constrained by an obligation of neutrality. We overrule Kennedy's first assignment of error.

### B. Manifest Weight of the Evidence

**{¶22}** In his second assignment of error, Kennedy argues that the murder conviction is against the manifest weight of the evidence because more credible evidence was presented showing that Kennedy acted in self-defense.

**{¶23}** Kennedy's avenue to challenge the State's proof relative to his claim of self-defense is with a challenge to the manifest weight of the evidence. *Messenger,* 2021-Ohio-2044, ¶ 45. In determining whether a criminal conviction is against the manifest weight of the evidence, we must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary. *State v. Thompkins,* 78 Ohio St.3d 380, 387 (1997); *State v. Hunter,* 2011-Ohio-6524, ¶ 119. To satisfy this test, the State must introduce substantial evidence on all the elements of an offense, so that the jury can find guilt beyond a reasonable doubt. *See State v. Eskridge,* 38 Ohio St.3d 56 (1988), syllabus. However, to prove the absence of self-defense, the

State need only present substantial evidence to disprove any one of the elements of self-defense. *State v. Messenger,* 2021-Ohio-2044, ¶ 50 (10th Dist.).

**{¶24}** A claim of self-defense includes the following elements: (1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger. *State v. Messenger*, 2022-Ohio-4562, ¶ 14, citing *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). Since H.B. 228 amended R.C. 2901.05, effective March 28, 2019, the burden regarding self-defense set forth in R.C. 2901.05(B)(1) is:

> A person is allowed to act in self-defense, defense of another, or defense of that person's residence. If, at the trial of a person who is accused of an offense that involved the person's use of force against another, there is evidence presented that tends to support that the accused person used the force in self-defense, defense of another, or defense of that person's residence, the prosecution must prove beyond a reasonable doubt that the accused person did not use the force in self-defense, defense of another, or defense of that person's residence, as the case may be.

**{¶25}** Kennedy argues that his conviction is against the manifest weight of the evidence because more credible evidence was presented showing he acted in self-defense. He argues that the victim can be seen reaching for a firearm and vocalizing a threat before Kennedy stabbed him. He also argues he was at a size and weapon disadvantage that made him feel terrified and that he would not survive unless he eliminated the threat by repeatedly stabbing the victim.

**{¶26}** The State is only required to disprove one of the elements of self-defense beyond a reasonable doubt to sufficiently disprove a defendant's claim of self-defense. A conviction is not against the manifest weight of the evidence because the trier of fact

believed the State's evidence over the defense's evidence. The trier of fact is free to believe all, part, or none of a witness's testimony. *State v. Marcum*, 2024-Ohio-2653, ¶ 18 (5th Dist.).

{¶27} Based on our review of the record, we do not find that the jury clearly lost its way in concluding the State proved that Kennedy did not act in self-defense when he fatally stabbed the victim. First, the State presented evidence that Kennedy was at fault in creating the situation giving rise to the affray. Law enforcements' testimony and the video from the apartment's security cameras showed Kennedy brandishing a knife at the victim when he arrived at in the lobby. The victim backed away and left the lobby, but Kennedy followed him outside even though Kennedy could have remained in the lobby, behind locked doors. The victim removed his gun only after Kennedy brandished a knife on him and he was retreating from Kennedy. Then Kennedy attacked the victim from behind before the victim even knew Kennedy was behind him. This evidence shows that Kennedy was at fault for creating the situation that led to the affray and that he was not acting in self-defense when he stabbed the victim.

{¶28} Kennedy also argues that there was evidence to suggest that he could have reasonably felt he was being threatened because the victim weighed more and had a gun. However, the State presented credible evidence that a reasonable person, under the same circumstances and with the same subjective beliefs and faculties, would not have a bona fide belief that he was in imminent danger of death or great bodily harm and that his only means of escape was the use of force. Kennedy and the victim did not know each other and had had no previous interactions. The victim had a handicap placard for his vehicle, walked with a limp, and did not threaten Kennedy as the victim approached

and waited in the lobby. The video showed Kennedy approaching this complete stranger with a knife and the victim retreating. Even if we believe Kennedy's version of events, he testified that the victim only threatened Kennedy if he went outside. *State v. Shane*, 63 Ohio St.3d 630, 637 (1992) ("words alone will not constitute reasonably sufficient provocation to incite the use of deadly force in most situations"); *State v. Becker*, 2023-Ohio-601, ¶ 26 (5th Dist.), citing *Shane, supra*. Kennedy admitted he felt no imminent threat because he testified that the victim was leaving and his testimony that the victim could come for him "sooner or later" and that he might "come back later" proves the opposite – there was no imminent threat. The State produced evidence that Kennedy did not need to use deadly force against the victim. He could have simply remained inside or retreated to his apartment to escape whatever imminent danger he perceived.

{¶29} After reviewing the entire record, weighing the evidence and all reasonable inferences, and considering the credibility of witnesses, we find that, in resolving conflicts in the evidence, the trier of fact did not clearly lose its way and created such a manifest miscarriage of justice that reversal of the conviction is necessary. The State introduced evidence to show that (1) Kennedy was at fault for creating the situation that led to the affray and (2) under the same circumstances a reasonable person could not have believed that he was in imminent danger of death or great bodily harm and his only way of escape was the use of deadly force. We overrule Kennedy's second assignment of error.

C. Insufficiency of the State's Evidence Disproving Self-Defense

{¶30} For this third assignment of error, Kennedy argues that the State produced insufficient evidence to refute his self-defense claim.

**{¶31}** We reject Kennedy's contention. As the State correctly argues, "sufficiency of the evidence" is not the correct framework to review Kennedy's self-defense claim. In *State v. Messenger,* 2022-Ohio-4562, the Supreme Court of Ohio rejected the argument that the State must produce sufficient evidence of the absence of self-defense as an element of every offense involving the use of force. The Court discussed the 2019 amendment to the self-defense statute and found that the change in R.C. 2901.05(B)(1) to the State's burden of persuasion on self-defense did not change the elements of murder. The requirement that "the state must disprove an affirmative defense beyond a reasonable doubt does not in itself cause the affirmative defense to become an element of the offense." *Messenger* at ¶ 24. "Self-defense remains an affirmative defense in Ohio, and an affirmative defense is not an element of a crime[.]" *Id.*

> Given the foregoing, a defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that the defendant's use of force was in self-defense. Similarly to the standard for judging the sufficiency of the state's evidence, if the defendant's evidence and any reasonable inferences about that evidence would allow a rational trier of fact to find all the elements of a self-defense claim when viewed in the light most favorable to the defendant, then the defendant has satisfied the burden.
>
> . . . . As the Tenth District aptly explained, the sufficiency-of-the-evidence standard of review applies to Messenger's burden of production and a manifest-weight-of-the-evidence standard of review applies to the state's burden of persuasion.

(Citations omitted). *State v. Messenger,* 2022-Ohio-4562, ¶ 25-26.

**{¶32}** As in *Messenger*, here the trial court provided the jury with an instruction regarding self-defense, which means that the trial court concluded Kennedy put forward sufficient evidence that he was acting in self-defense when he fatally stabbed the victim. The jury's guilty verdict here, like the guilty verdict in *Messenger*, means that the State

met its burden of persuading the jury beyond a reasonable doubt that Kennedy was not acting in self-defense. Because the State does not bear the burden of production on self-defense, "sufficiency of the evidence" is not the proper framework to review whether the State proved the absence of self-defense. *State v. Messenger*, 2021-Ohio-2044, ¶ 44 (10th Dist.), *aff'd*, 2022-Ohio-4562. The proper avenue to review the State's presentation of evidence disproving self-defense is the manifest weight of the evidence framework, which we addressed when reviewing Kennedy's second assignment of error. For this reason, we overrule Kennedy's third assignment of error.

### D. Curative Instructions to the Jury

**{¶33}** For his fourth assignment of error, Kennedy argues that the trial court erred by failing to give the jury curative instructions following sustained objections. He identifies three instances in the record where this alleged error occurred: (1) during the State's opening statement; (2) when law enforcement testified that Kennedy did not "care about what just happened;" and (3) when the State described the apartment security camera video as an "unaltered, unbiased view of what happened."

**{¶34}** However, we find that Kennedy did not request a curative instruction and has waived any error. *State v. Hale*, 2008-Ohio-3426, ¶ 171 ("The defense did not request curative instructions in either case, thus waiving any claim to such instructions."); *State v. Davie*, 80 Ohio St.3d 311, 322 (1997). "The failure to request a curative instruction at the time error can be avoided precludes any claim of error on appeal." *Republic Steel v. ProTrade Steel Co.*, 2018-Ohio-469, ¶ 43 (5th Dist.). Furthermore, as to the State's opening statement, Kennedy fails to explain how the court's instructions failed to cure any error that may have been created by the prosecutor's reference to a photograph that was

later determined to be inadmissible. The trial court's instructions to the jury prior to the start of trial included the instruction, "Opening statements are not evidence, but are merely designed to assist the jury in evaluating the evidence. The opening statements should give you an overall picture of what each side thinks the evidence will be." The trial court repeated the instruction at the close of the case, "The evidence does not include . . . opening statements. The opening statements . . . are not evidence. They are designed to assist you in evaluating the evidence."

**{¶35}** Because Kennedy did not request curative instructions, he waived any error. We overrule Kennedy's fourth assignment of error.

## III. CONCLUSION

**{¶36}** For the foregoing reasons, we overrule appellant's assignments of error and affirm the decision of the Stark County Court of Common Pleas.

.

By: Hess, J.
Hoffman, P.J.
Smith, J. concur